208 N.J. Super. 697 (1986)
506 A.2d 834
WINDMERE, INC., A CORPORATION, PLAINTIFF-APPELLANT,
v.
INTERNATIONAL INSURANCE COMPANY, A CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1985.
Decided March 21, 1986.
*699 Before Judges O'BRIEN, SIMPSON and SCALERA.
Terence P. Corcoran argued the cause for appellant (Corcoran & Higgins, attorneys; Terence P. Corcoran, of counsel and on the brief).
Edmund E. Lynch argued the cause for respondent (Lynch & Lynch, attorneys; Mr. Edmund E. Lynch, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
*700 Plaintiff appeals from a jury verdict in favor of defendant insurance company on plaintiff's claim for a fire loss. The principal issue in this case is the admission of voiceprints into evidence based upon a finding of sufficient reliability by the trial judge. We affirm.
Plaintiff Windmere, Inc. is a corporation of which Thomas Ciambrone, Jr., is president and sole stockholder. The corporation owned property upon which a restaurant was being operated. In 1978 or 1979, Thomas Ciambrone, Jr. moved to Florida and turned over operation of the restaurant to his brother Jerry Ciambrone and Robert Nardi, which they operated through Crosswinds Restaurant Corporation. Jerry Ciambrone and Nardi agreed to pay maintenance expenses of the building and, after a certain point, pay plaintiff a share of the profits.
At 3:14 a.m. on March 12, 1982, a telephone report was made to the West Milford Police Department that the restaurant was on fire. The caller also said there was a bomb inside the burning building. A tape recording was made of the telephone call. Between 4:00 and 4:30 a.m. on the morning of the fire, Thomas Ciambrone, Jr. received a telephone call at his home in Florida from his uncle, Rex D'Angelis, about the fire. Ciambrone's uncle lived close to the restaurant and was responsible for maintaining and overseeing the building.
Defendant had issued a policy of insurance on the building covering fire loss in the amount of $600,000 which was in effect at the time of the fire. Defendant's refusal to pay plaintiff's claim, based upon a contention that plaintiff's officers, directors and employees had either set the fire or had knowledge that the fire would be intentionally set, precipitated this suit.
At trial, plaintiff presented the testimony of a fire investigator who said the "fire had been caused by the willful and malicious act of arson, and that an accelerant had been used to cause the building to burn faster and create more damage." Thomas Ciambrone, Jr. testified he was in Florida at the time of *701 the fire. Plaintiff also called William Brickman, president of the bank which holds the mortgage on the property, who had also been a volunteer fireman. Brickman testified that Thomas Ciambrone, Jr. called him from Florida at approximately 7:00 a.m. to inquire whether there had been a fire in the restaurant. Plaintiff's insurance agent testified that he had been called by Thomas Ciambrone, Jr. at about 6:30 a.m. on the morning of the fire and asked to go over and see what was going on.[1]
Detective Sergeant Albert E. Hooper (Hooper) of the West Milford Township Police Department testified as to various articles found in the building, including a blue jacket bearing shoulder patches which read "Chrysler Drag Seminar 1973." The police also found a set of keys in the jacket, including a key for the rear door of the building. Since the police found no evidence of forced entry, Hooper believed that the arsonist entered the building through the rear door using the key found in the blue jacket. Investigators also found a plastic five-gallon container in the foyer of the building which contained a residue of gasoline.
After a Evid.R. 8 hearing, Detective Hooper was permitted to testify as to statements given to him by Howard Bodell (Bodell) who was employed by T & J Trucking, another company owned and operated by Thomas Ciambrone, Jr. Bodell also worked as a maintenance man at the restaurant when there was no work for him at T & J Trucking. Bodell told Hooper he had purchased gasoline on March 9 at a local service station which he intended to use to soften asphalt in order to repair a gas pipe at the restaurant. The gasoline had been placed in a small plastic container. Although Bodell at first said he purchased only one gallon, he was confronted with the credit-card slip, which was *702 for the account of Thomas Ciambrone, Jr. and indicated two gallons had been purchased. Bodell then recalled he bought two gallons of gasoline and had only used a portion of one gallon and had taken the other gallon home.
Since the telephone call reporting the fire had been tape recorded, the police made an exemplar of Bodell's voice on the telephone in which he repeated the caller's statements. These tapes were delivered by the Passaic County Prosecutor's Office to Voice Identification, Inc., whose president, Ernst F.V. Alexanderson (Alexanderson), reported that:
We have completed our analysis and have been able to identify ten matching words between the unknown caller and Mr. Howard Bedell [sic]. Our aural examination concurs with the spectrographic portion, and we feel sure beyond a reasonable doubt that Mr. Howard Bedell [sic] made the bomb threat call.
On this appeal, plaintiff argues that there was insufficient evidence at the Evid.R. 8 hearing as to the reliability of spectrograms[2] to warrant their admission into evidence. In addition, plaintiff contends that comments by defense counsel in summation were prejudicial and that the trial judge erred in permitting the hearsay statements of Bodell to be received through the testimony of Sergeant Hooper.[3] We first address the issue of the admission of the spectrograms since defendant conceded at oral argument that such evidence was extremely prejudicial and if improperly admitted probably should lead to a reversal.
Plaintiff first contends that the Evid.R. 8 hearing as to the admissibility of the spectrographic evidence was inadequate and seeks a remand for a new hearing. Although this contention suggests surprise, approximately six months before *703 trial defendant provided plaintiff with a copy of Voice Identification, Inc.'s report and informed plaintiff of defendant's intention to proffer this report at trial. Furthermore, defendant filed a trial brief in support of the admissibility of spectrographic evidence. Plaintiff's failure to adequately prepare to meet defendant's proffer of voiceprint evidence is no basis to remand for a new Evid.R. 8 hearing. While the issue might have been addressed at a pretrial Evid.R. 8 hearing, as now contended by plaintiff, neither party sought such a hearing. Thus the issue of admissibility was properly examined at a Evid.R. 8 hearing during the course of the trial.
At the Evid.R. 8 hearing, defendant offered the testimony of Alexanderson and Detective Lieutenant Lonnie Smrkovski (Smrkovski), commanding officer of the Voice Identification Unit of the Michigan Department of State Police, in support of the admissibility of spectrographic evidence. Professor Louis J. Gerstman, professor of psychology and speech and hearing sciences at City University of New York, testified on behalf of plaintiff against admissibility. After the hearing, the judge found spectrograms sufficiently reliable for admission into evidence when offered through the testimony of a qualified expert, and when coupled with aural evidence from which the jury itself can compare the questioned tape with the exemplar. Accordingly, the proffered testimony was ruled admissible and Alexanderson subsequently testified before the jury as to the findings in his spectrographic report. Plaintiff, however, offered no expert testimony before the jury.[4]
Admissibility of spectrograms has not been finally adjudicated in New Jersey. In State v. Cary, 49 N.J. 343 (1967), the Supreme Court ruled that the prosecution could compel a defendant *704 to submit to a voice test in order to conduct a spectrographic examination. Id. at 352. However, the Court expressly did not decide the subsequent admissibility of the resulting voice print, leaving to the trial judge the determination of whether the technique and equipment had a sufficient basis. Ibid. Upon remand, the trial court concluded that, although the spectrograph was an efficient and accurate piece of equipment, the reliability of the spectrogram, i.e., the product produced by the spectrograph, was still subject to scientific question. State v. Cary, 99 N.J. Super. 323, 332 (Law Div. 1968). Consequently, the trial judge refused to permit any identification opinion resulting from the tape-recorded messages that had been compared by the expert. Id. at 334. On application of the State to produce further expert testimony, the Supreme Court remanded the issue for that purpose, because of the far-reaching implications of admission of voiceprint evidence. State v. Cary, 53 N.J. 256, 258 (1969). The State, however, was unable to furnish any additional scientific support for the reliability of voiceprints, and the Supreme Court affirmed the trial judge's exclusion of this evidence. State v. Cary, 56 N.J. 16 (1970).
The issue was again addressed by our Supreme Court in State v. Andretta, 61 N.J. 544 (1972). After noting that "... the voiceprint method today has much more support for its admissibility as evidence than at the time of Cary," the Court found it unnecessary to decide whether the result of a voiceprint analysis would routinely be admissible at trial because the issue before it was only whether defendants could be compelled to give an exemplar for comparison. Id. at 551. The Court said:
The significant scientific experiments and recent judicial acceptance of the voiceprint method since Cary convince us that the support for this method now rests on considerably more than the word of a single man. In light of the developments since Cary, we believe that it is no longer unreasonable to order these defendants to speak for purposes of this test. After this test is completed and the State indicates that it intends to offer the results of the test at trial, the trial judge shall hold an additional pre-trial hearing to determine whether any identification arrived at through the use of this method is sufficiently reliable to be admissible in light of the proofs which will be adduced as to what *705 the test shows, and such cross-examination of the State's experts and such opposing proofs as defendants may be able to offer. [at 551-552]
In 1978 a trial judge ruled such evidence inadmissible in a matrimonial action in which a wife sought to demonstrate that certain telephone conversations involved her husband. D'Arc v. D'Arc, 157 N.J. Super. 553 (Ch.Div. 1978). The judge considered the testimony of various witnesses on the reliability of spectrograms and found that the proofs presented to him fell short of the applicable test, which in his opinion demonstrated not only that voiceprint was not generally accepted but that, on the whole, the scientific community rejected it. Id. at 562.
The D'Arc case, as do the recent cases relied upon by plaintiff, Cornett v. State of Indiana, 450 N.E.2d 498 (Ind. 1983), and State v. Gortarez, 141 Ariz. 254, 686 P.2d 1224 (1984), represents a strict application of the rule announced in the seminal case on the admissibility of scientific evidence, Frye v. United States, 293 Fed. 1013 (D.C. Cir.1923), where the court said:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable states is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. [at 1014]
This language has been interpreted to mean that scientific evidence is admissible only upon a showing that it has gained general acceptance within the scientific community in which it belongs.
Much has been written on the admissibility and weight of voiceprint evidence. See 97 A.L.R.3d 294, (1980) "Admissibility and Weight of Voice Print Evidence." Within that debate the continued viability of the Frye test has been discussed. For example, Professor Paul C. Gianelli, in his article "The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half-Century Later," 80 Colum.L.Rev. 6, p. 1197, 1250 concluded:

*706 The Frye test, which has cast its shadow over the admissibility of scientific evidence for more than a half century, has proved unworkable. Nevertheless, the underlying rationale of the Frye test  requiring evidence derived from newly ascertained or applied scientific principles to meet a special burden as a prerequisite to admissibility  has merit. The major flaw in the relevancy analysis, the principal alternative to Frye, is its failure to recognize the distinctive problems of scientific evidence. In accessing probative value under this approach, the judge frequently is forced to defer to an expert, thereby permitting admissibility based on the views of a single individual in some cases. Consequently, voiceprints, the paraffin test, trace metal detection technique, psychological stress evaluation, as well as other insufficiently validated techniques may readily gain admissibility.
The proposal set forth in this Article accepts the premise of Frye, at least in criminal cases, but rejects the standard of Frye. In contrast to the relevancy approach, this proposal highlights the unique reliability problems associated with the admissibility of innovative scientific procedures and provides a principled approach for distinguishing `good' science from `bad' science.
The author suggests three factors to judge the reliability of evidence derived from a scientific principle: (1) the validity of the underlying principle, (2) the validity of the technique applying that principle, and (3) the proper application of the technique on a particular occasion. Applying these premises to voiceprint identification, he says:
For example, voiceprint identification is premised on the uniqueness of the human voice. If the theory of voice uniqueness is not valid, voiceprint evidence is not reliable. If, however, the uniqueness of the human voice were established, it would not necessarily follow that the voiceprint technique is capable of detecting that uniqueness. Finally assuming a valid theory and technique, a defective instrument (sound spectrograph), an unqualified operator, of a failure to follow the prescribed procedures, may also produce unreliable results. [at 1202]
In United States v. Williams, 583 F.2d 1194 (2d Cir.1978), cert. den. 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77, in finding spectrographic evidence admissible, the court said of the Frye test:
An oft-cited test, first laid down in Frye v. United States, ... requires "general acceptance in the particular field to which it belongs." The "Frye" test is usually construed as necessitating a survey and categorization of the subjective views of a number of scientists, assuring thereby a reserve of experts available to testify. Difficulty in applying the "Frye" test has led a number of courts to its implicit modification. See United States v. Baller, [519 F.2d 463 (4th Cir.), cert. den. 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975).] [at 1197-1198]
*707 Although the Third Circuit has not yet resolved the admissibility of spectrographic evidence, see, e.g., United States v. Baynes, 687 F.2d 659 (3rd Cir.1982), it has concluded that the Frye test suffers from serious flaws. As stated in United States v. Downing, 753 F.2d 1224, 1237 (3rd Cir.1985):
For these reasons, we conclude that `general acceptance in the particular field to which [a scientific technique] belongs,' Frye, 293 F. at 1014, should be rejected as an independent controlling standard of admissibility. Accordingly, we hold that a particular degree of acceptance of a scientific technique within the scientific community is neither a necessary nor a sufficient condition for admissibility; it is however, one factor that a district court normally should consider in deciding whether to admit evidence based upon the technique.
The court, of course, was applying the Federal Rules of Evidence, particularly R. 702, which is not unlike New Jersey's Evid.R. 56(2). The court also referred to Professor Giannelli's article and Professor Cleary in McCormick on Evidence (3d ed. 1984), in reaching its conclusion.
In his book, "Forensic Voice Identification," which was received into evidence at the Evid.R. 8 hearing below, Detective Smrkovski discusses the divergence of opinion as to the Frye rule and quotes the following from the Second Edition of McCormick on Evidence, § 203 at 491:
`General scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion.[5]
Yet Professor Cleary, in commenting on spectrographic analysis in the Third Edition of McCormick On Evidence, § 207 at 639, concluded:
In the 1960's, it was proposed that the spectral characteristics of a speaker's voice could serve to identify that speaker. The theory behind this suggestion was that individuals have different but largely stable patterns in the way they *708 manipulate their lips, teeth, and so on in speaking. From the outset, this hypothesis has been controversial. If it is false, then comparisons of spectrograms should not produce consistently correct identifications. Despite a few early (and seemingly extravagant) claims of accurate identifications, subsequent studies providing better approximations of realistic forensic conditions report misidentifications at rates ranging from 18% (12% false negatives and 6% false positives) to 70 and 80% (including 42% false positives). Many scientists continue to express doubts about the reliability and validity of the current technique.
Most courts applying the general scientific acceptance test to voice spectrographic evidence have held the evidence inadmissible. In fact, this evidence has inspired some of the most spirited and thoughtful defenses of the general acceptance standard for scientific evidence. On the other hand, faith in the method and a belief that jurors will not find it overly impressive has prompted some courts to bend the Frye test to the breaking point in order to conclude that the evidence should be admissible. Whatever standard may be applied, however, it seems that until further research makes the validity of the technique plainer, the courts will remain divided over the admissibility of voice spectrographic identification.
Thus, while the topic of spectrographic evidence has been extensively reviewed, its admissibility remains questionable.
In the context of the admissibility of other scientific evidence, our Supreme Court has commented on Evid.R. 56(2) which provides that a witness who is otherwise qualified under Evid.R. 19 may testify by giving an opinion on matters which require scientific, technical or other specialized knowledge, if that testimony will assist the trier of fact to understand the evidence or determine a fact in issue. There are three basic requirements under this rule: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable, and (3) the witness must have sufficient expertise to offer the intended testimony." State v. Kelly, 97 N.J. 178, 208 (1984).
Therefore, the question presented is whether voiceprint analysis has reached a "state of the art" such that expert testimony in this field is sufficiently reliable for admission into evidence. The results of scientific tests are admissible if there is proof that they have a sufficient scientific basis to produce uniform and reasonably reliable results. Romano v. Kimmelman, *709 96 N.J. 66, 80 (1984). Reliability is demonstrated by showing that the technique employed has gained sufficient scientific basis for general acceptance within the scientific community. Ibid.[6] This does not mean that there can be no dispute over the precise accuracy of the device employed or that the possibility of error must be excluded. State v. Johnson, 42 N.J. 146, 171 (1964). As the Court noted, "practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters." Ibid. So long as the technique is generally considered reliable among scientists, the evidence may be admitted, leaving its probative value and weight to the factfinder. Ibid.; see also Romano v. Kimmelman, supra, 96 N.J. at 80.
In State v. Cavallo, 88 N.J. 508, 521 (1982), the Court said that while proving general acceptance in the scientific community was one way of showing reliability, "[w]e need not at this time conclude that this is the only permissible means of demonstrating reliability."[7] However, no subsequent case has offered an alternative means of proving reliability, and in Romano, the Court said reliability "must be demonstrated by showing that the scientific technique has gained general acceptance within the scientific community." 96 N.J. at 80; citing State v. Johnson, supra, 42 N.J. at 170-171. [Emphasis supplied.]
*710 Thus, while our Supreme Court has not clearly abandoned the Frye test, it seems to have modified it to the rather vague standard that a scientific technique have "sufficient scientific basis to produce uniform and reasonably reliable results and contribute materially to the ascertainment of truth." State v. Cary, 49 N.J. 343, 352 (1967) (voiceprint); State v. Hurd, 86 N.J. 525, 536 (1981) (hypnosis); State v. Cavallo, 88 N.J. 508, 520 (1982) (psychiatric testimony as to psychological traits of a rapist); Romano v. Kimmelman, 96 N.J. 66, 80 (1984) (breathalyzer); State v. Kelly, 97 N.J. 178, 210 (1984) (battered woman syndrome).
At the Rule 8 hearing in this matter, Alexanderson testified as to his attendance at many seminars on voice identification. In his opinion, although the use of spectrographic identification is not infallible it is accurate. A pioneer in the field named Lawrence Kersta,[8] who developed the voiceprint technique while a physicist at Bell Laboratories and with whom Alexanderson served as an apprentice, performed studies in 1961 and 1962 which demonstrated that spectrograms were 99% accurate, even when the people making the comparisons were untrained. Alexanderson admitted, however, that the identification process is subjective. Alexanderson further testified that voiceprint analysis is generally accepted by the scientific community, although he did not specifically identify that community.
Detective Smrkovski, who has a degree in audiology and speech science from Michigan State University and who is a member of the Acoustical Society of America and certified by the International Association for Voice Identification, and who also worked with Dr. Oscar Tosi of Michigan State University and Lt. Edward Nash of the Michigan State Police, testified that spectrographs can be reliable if the people who analyze the data are properly trained. He conceded, however, that among *711 people with knowledge of spectrographs there is a divided camp as to its reliability. Some people believe if the method is used cautiously it can be reliable, while others find a high degree of error.[9] Smrkovski named several former opponents of spectrograms who have recently changed their minds as to the reliability of this technique.
As noted, plaintiff relied on the testimony of Professor Louis J. Gerstman (Gerstman) in opposing the voiceprint evidence. At the Evid.R. 8 hearing, Gerstman referred to an error rate of between 10% to 50%. He stated that the use of spectrograms was unreliable because of the numerous factors which serve to vary the results, including the quality of recordings, differences in recordings that are made at different times, the rate of the tape recorder being used (which influences frequency), and the lack of research on the probability of error. He expressed the opinion that spectrograms had not been accepted in the scientific community based upon a poll conducted in the late 1970's among members of the Acoustical Society in which 90% of those polled believed that voice prints were unreliable. Gerstman testified that only a few pioneers in the field believe in its reliability, while over a hundred people he knew did not believe in it.
Since the trial judge deemed the addition of the opportunity for aural evaluation to the spectrographic comparison significant, he questioned Gerstman as follows:
THE COURT: Alright. Now, what happens when you combine that with an aural evaluation of the voices?
THE WITNESS: It gives the person doing the job a higher subjective certainty in their 
THE COURT: What percentage would they come to with respect to error when that combination is used?

*712 THE WITNESS: The proponents of this activity maintain that it improves their conclusion.
THE COURT: But not percentage is ...
THE WITNESS: A formal test of that has not been made. Not in the framework of, you know, forensic framework.
THE COURT: Is it your position that this type of evidence should not  well, first of all, what is you position with respect to a person trained in the field giving an opinion if he has available to him both the spectrograms and the aural evaluation?
THE WITNESS: My opinion is that he can do it on the basis of his own listening, but that when he brings the spectrograms to court, that he creates a false air of scientism.
THE COURT: Well, we take care of that. We tell the jurors that they don't have to believe that witness any more than they have to believe a doctor. We can handle that.[10]
THE WITNESS: Your Honor, you see, if it could be made certain that, you know, that juries understand that even with the pictures in hand it's a subjective judgment.
THE COURT: I know, but the way we take care of it his adversaries have the right to bring in opposing views, such as you, to testify before the jury and let the jury decide whether or not the person is an expert, how qualified he is to give the opinion he gives, and they can believe all of what he says, none of what he says or in between. We tell them that. So on the basis, do you see any ...
THE WITNESS: If you could, you know, if you assure me, sir, that the jury will not consider the opinion any less subjective because the pictures are present, then, you know, I don't see the harm that is done.
The scientific community specifically involved in spectrographic examination appears to be limited. The same advocates *713 and critics of voiceprint technique have appeared in various courts around the country to offer their opinions as to its reliability. However, as noted in State v. Andretta, 61 N.J. 544, 551 (1972), the view that spectrographs are reliable is no longer confined to one man but is shared by a community, albeit a small community. Although Gerstman considers subjective evaluations by comparison of spectrograms unreliable, he considers the spectrograph a reliable instrument and agrees that it can be properly used to accurately eliminate a person as the unidentified speaker.
Although the ruling by the trial judge finds spectrographic comparisons coupled with aural comparisons of the taped voices involved to be "sufficiently" reliable,[11] the jury was free to conclude otherwise. The determination of an expert's competency to testify and of the sufficiency, as distinguished from the weight of the testimony, is primarily for the discretion of the trial judge. An appellate court will only interfere where there has been a clear abuse of discretion. Fantini v. Alexander 172 N.J. Super. 105, 109 (App.Div. 1980).
While the admissibility of spectrographic evidence in New Jersey is not entirely clear, we conclude that in this civil[12] case, the trial judge did not abuse his discretion in admitting the evidence. One of Professor Gerstman's concerns was that the use of spectrograms "creates a false air of scientism." The court in United States v. Downing, 753 F.2d 1224 (3d Cir.1985), in addressing this concern said:

*714 The danger that scientific evidence will mislead the jury might be greater, for example, where the jury is not presented with the data on which the expert relies, but must instead accept the expert's assertions as to the accuracy of his conclusions. [at 1239]
Here, as noted by the trial judge, not only did the jury have the spectrograms but they also had the tapes from which the spectrograms were made which they could compare aurally. The jury was fully instructed as to their discretion to accept or reject Alexanderson's testimony based upon the spectrograms. See footnote 10. It was plaintiff's decision not to offer the testimony of Professor Gerstman, or any other witness, before the jury as to the reliability or accuracy of spectrographic evidence. See footnote 4. Furthermore, there was no question that the fire which destroyed the restaurant building was an act of arson. Plaintiff itself presented evidence of this fact. Although the voiceprint evidence was offered to identify Bodell as the arsonist, it was only part of the evidence linking Bodell with the fire. However, identifying Bodell as the arsonist did not necessarily implicate plaintiff in the arson. It was only one factor connecting plaintiff with the intentional burning of the building. There was other substantial evidence to support that conclusion by the jury. We find no error in the admission of the spectrographic evidence.
We now turn to the remaining issues advanced by plaintiff on this appeal. We find no error in the admission of Hooper's testimony reporting the hearsay statements of Howard Bodell. In answers to interrogatories which were received into evidence, plaintiff, in response to a question seeking the names of persons "who were in charge of the business and financial affairs of the corporation at the time of the event, accident, occurrence or claim," stated "Howard Bodell, 70 Terrace Avenue, Butler, New Jersey. Responsible for actual maintenance work at restaurant." Clearly, the statements made by Bodell were within the hearsay exception of Evid.R. 63(9)(a), as a person "responsible for the actual maintenance work at the restaurant." Statements which he gave concerning his employment *715 with plaintiff were statements which "when made ... concerned a matter within the scope of a then existing agency, employment or representative relationship." Evid.R. 63(9)(a); see also Nobero Co. v. Ferro Trucking, Inc., 107 N.J. Super. 394, 404 (App.Div. 1969).
Lastly, plaintiff contends that it was unduly prejudiced by two comments made by defendant's attorney during his summation concerning plaintiff's failure to produce certain witnesses. Although plaintiff did not seek a mistrial, it contends that the comments amounted to plain error which justify reversal. Defendant produced evidence that the restaurant was operating at a loss and that unsuccessful efforts to sell it had been made. There was also testimony that business was slow and that the restaurant was not operating full time. In his summation, defense counsel suggested that this had not been contradicted; that none of plaintiff's employees, specifically Rex D'Angelis or William Hawkins, had testified contrary to this. Unfortunately, the side-bar discussion concerning counsel's objection was not on the record, but thereafter no further reference was made to this in the summation. A much more serious reference concerned the jacket bearing racing-car designs which had been found in the restaurant. There had been evidence that Jerry Ciambrone, Thomas' brother, had an interest in racing. Although Jerry was undeniably in Florida on the day of the fire and was in jail at the time of trial, counsel sought to connect the racing jacket found at the scene to Jerry. The summation was interrupted by a discussion with the judge, after which the judge concluded that he would not give any instruction as to any inference raised by a witness' absence and later instructed the jury that all comments connecting the jacket to Jerry were to be disregarded. It must be assumed that the jury followed the judge's instruction. State v. Manley, 54 N.J. 259, 271 (1969). We find no error.
Affirmed.
NOTES
[1] The agent also testified that although he had increased the insurance coverage on the building, he did so without a request from anyone. Thomas Ciambrone, Jr. testified he called Brickman between 5:30 and 6:00 a.m. At trial defendant argued that these two witnesses were called by Thomas Ciambrone, Jr. to establish that he was in Florida and without knowledge of the fire.
[2] Plaintiff contended that the term "voiceprint" as a pseudonym for spectrogram is a deliberate misnomer to suggest that a spectrogram has the same significance as a fingerprint. The word "voiceprint" was apparently coined by persons at Bell Labs where the spectrograph was developed.
[3] It was agreed that Bodell would not be called as a witness since he refused to testify at a deposition on the basis of his Fifth Amendment privilege.
[4] We recognize plaintiff's argument that it did not obtain an expert to examine the questioned tape recording and exemplar for preparation of a spectrographic report. Plaintiff could, however, have offered testimony before the jury as to the unreliability of spectrographic evidence generally, as it offered at the Evid.R. 8 hearing on admissibility.
[5] That paragraph in McCormick continues:

Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts use this approach instead of repeating a supposed requirement of `general acceptance' not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.
[6] The Romano court cited State v. Johnson, 42 N.J. 146, 170-171 (1964), as authority for this proposition. However, the cited section does not refer to the "scientific community" but says, "All are now generally scientifically recognized as sufficiently reliable."
[7] The courts have recognized three methods of proving scientific acceptance:

... (1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance. [State v. Kelly, supra, 97 N.J. at 210, citing State v. Cavallo, supra, 88 N.J. at 521.]
[8] See L. Smrkovski, History in Forensic Voice Identification, p. 2.
[9] Smrkovski explained that the person analyzing the spectrogram could come to one of five decisions: (1) a positive identification; (2) a positive elimination; (3) probable identification; (4) probable elimination, and (5) it was not possible to reach a conclusion on the samples submitted.
[10] The trial judge charged the jury:

Now, just because a man has testified as an expert does not mean that you must accept his opinion as correct. You should weigh and consider his testimony just as you would that of any other witness and make your own determination as to whether his testimony and his opinion is true and correct. And when you weigh and consider the testimony of an expert witness, you must decide for yourselves whether he is, in fact, an expert and how qualified he is to give the opinions he gives. You may consider his education and background, his interest, if any, in the outcome of the case, the extent of his investigation and inspection or examination if he made any, the basis upon which he draws the conclusions and states the opinions he gives, and any matters which assist you in determining the weight you will give to the testimony and opinion of such so-called expert witness. And as is the case with any witness, you are free to accept the witness' entire testimony or reject his entire testimony or accept as correct only a portion thereof, which you find to be credible and reject the rest.
[11] In admitting the evidence, the trial judge relied on United States v. Baller, 519 F.2d 463 (4th Cir.), cert. den. 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). See also United States v. Williams, 583 F.2d 1194 (2d Cir.1978).
[12] While we express no opinion as to the admissibility of voiceprint evidence under similar circumstances in a criminal case, we observe that the trial judge said in State v. Cary, 99 N.J. Super. 323 (Law Div. 1968):

The need for a high degree of scientific acceptance, and particularly reliability, is vital when a criminal case is involved where the individual's freedom, or in fact, his life, may be at stake. [at 333]