38 A.3d 644 (2012)
424 N.J. Super. 448
BUILDING MATERIALS CORPORATION OF AMERICA d/b/a GAF Materials Corporation, Plaintiff-Appellant/Cross-Respondent,
v.
ALLSTATE INSURANCE COMPANY (as successor to Northbrook Excess & Surplus Insurance Company); American International Surplus Lines Insurance Company; Atlanta International Insurance Company; Birmingham Fire Insurance Company; Employers Casualty Company a/k/a Acceptance Casualty Company; Employers National Insurance Company; Gulf Insurance Company; Hartford Accident & Indemnity Company and Hartford Fire Insurance Company; Industrial Insurance Company of Hawaii, Limited a/k/a Westchester Surplus Lines Insurance Company; Certain Underwriters at Lloyd's London and Certain London Market Companies; Michigan Mutual Insurance Company a/k/a Amerisure Mutual Insurance Company; Mission National Insurance Company a/k/a Danielson National Insurance Company; New England Insurance Company; New England Reinsurance Corporation; Old Republic Insurance Company; Republic Insurance Company; Royal Indemnity Company; Safety National Casualty Corporation; Stonewall Insurance Company; Twin City Fire Insurance Company; Westchester Fire Insurance Company, Defendants, and
National Union Fire Insurance Company of Pittsburgh, P.A., Defendant-Respondent/Cross-Appellant.
Docket No. A-4444-09T3
Superior Court of New Jersey, Appellate Division.
Argued December 19, 2011.
Decided March 13, 2012.
*649 Robin L. Cohen argued the cause for appellant/cross-respondent (Kasowitz, Benson, Torres & Friedman, LLP, attorneys; Ms. Cohen and Elizabeth A. Sherwin, of counsel and on the brief).
Barbara I. Michaelides (Bates Carey Nicolaides LLP) of the Illinois bar, admitted pro hac vice, argued the cause for respondent/cross-appellant (Harwood Lloyd, LLC, and Ms. Michaelides, attorneys; Ms. Michaelides, Paula M. Carstensen (Bates Carey Nicolaides LLP) of the Illinois bar, admitted pro hac vice, Kevin D. Szczepanski (Hodgson Russ LLP) of the New York bar, admitted pro hac vice, Lisa A. Bauer (Hodgson Russ LLP) of the New York bar, admitted pro hac vice, Benjamin M. Zuffranieri, Jr. (Hodgson Russ LLP) of the New York bar, admitted pro hac vice, Michael B. Oropollo, and Peter E. Mueller, Hackensack, on the brief).
Before Judges SABATINO, ASHRAFI and FASCIALE.
The opinion of the court was delivered by
FASCIALE, J.A.D.
In this insurance coverage dispute, plaintiff Building Materials Corporation of America d/b/a GAF Materials Corporation (GAF) appeals from a judgment of no cause of action entered after a lengthy jury trial; and defendant National Union Fire Insurance Company of Pittsburgh, PA (National Union) cross-appeals from an order denying its motion for a new trial on its counterclaim. We affirm on the appeal and cross-appeal.
After settling a class action lawsuit in which claimants alleged potential third-party property damage, GAF sought indemnification under a National Union insurance policy that excluded coverage for property damage to GAF's own products. Consistent with recognized principles of insurance law, the parties do not dispute that if GAF offered sufficient evidence to establish a prima facie loss within the coverage of the policy, then the burden of proving that the loss fell within the exclusionary provisions of the policy would shift to National Union.
The primary issue on appeal is whether GAF may establish a covered loss under the policy by showing either that the class action claimants alleged potential damage to third-party property, or that the class action settlement included payment for third-party property damage. We hold that on its claim for indemnification under National Union's insurance policy, GAF cannot establish a prima facie case of covered loss simply by demonstrating that the class action claimants alleged potential third-party property damage; rather, it must show that the underlying settlement *650 actually included payment for such claimed damages. The burden then shifts to National Union to show that the policy excludes the loss. Because GAF's proofs at trial failed to satisfy these requirements, the jury verdict rejecting GAF's claims was legally sound. Additionally, we affirm the judgment dismissing the counterclaim.

I.
GAF is a manufacturer of organic and fiberglass roofing shingles. Its shingles are sold with limited warranties that require GAF to replace its defective products at a reduced cost. A customer may invoke the warranty provisions by reporting a premature deterioration or other irregularity of the shingles. GAF received thousands of complaints that its shingles aged and cracked prematurely.
On March 20, 1996, a class action lawsuit was filed in the Alabama state courts on behalf of various homeowners against GAF (underlying lawsuit or Coleman claimants).[1] The Coleman claimants alleged that their GAF roofing shingles were defective because they began to deteriorate "only a few years after installation." They also alleged that GAF committed fraud by concealing the defects from the public, violated the consumer protection statutes of various states, breached express and implied warranties, and acted negligently.[2]
In addition to obtaining coverage at various times from other insurers, GAF purchased a claims-made, excess general liability insurance policy (the policy) from National Union with a policy period of March 28, 1996 to March 28, 1997. The policy provided a liability limit of $25 million, excess of a $2 million self-insured retention. The policy excluded coverage for property damage to GAF's own products.
In 1996, GAF notified National Union that it had been served with the complaint in the underlying lawsuit. GAF advised National Union that it believed that the allegations were without merit, selected defense counsel, and promised to keep National Union informed. GAF then retained defense counsel "to protect [GAF's] interests."
In 1997, National Union advised GAF that it reserved its rights to disclaim coverage for the Coleman claimants and requested more information to evaluate the lawsuit. National Union explained that Coleman involved allegations that the roof shingles
were rigid and inflexible and inherently weak to the extent that they could not adequately contract or expand with changes in temperature. This alleged rigidity and weakness in the product caused the shingles to become prone to cracking and/or splitting after only a few seasons or years of use.
National Union warned GAF that "[s]hould these claims not involve `property damage,' as defined by the policy, there is no coverage."
On September 24, 1998, GAF settled the underlying lawsuit for approximately $63 million dollars.[3] In its settlement notice, GAF explained that "[t]he Settlement allows *651 Eligible Claimants ... to recover certain costs of repair or replacement of Damaged GAF Shingles." The settlement also established a compensation formula. Coleman claimants generally had the option of receiving compensation in the form of (1) cash for labor plus a coupon for replacement roofing shingles; (2) all cash for both labor and materials; or (3) a coupon for upgraded replacement materials at a reduced cost.
The settlement agreement defined "damage" to GAF shingles as any defects adversely affecting the performance of the shingle during its warranty term. The agreement defined "consequential damages" as
damage to the structure or contents of a Property resulting from Damage to GAF Shingles. Consequential Damages do not include any labor or material costs associated with the repair or replacement of the GAF Shingles or any other roofing materials (e.g., flashing, underlayment, gutters, drip edge, and ice and water barrier).
The agreement further stated that
[c]laims for Consequential Damages are not released by the terms of this Agreement, and by filing a Claim in the Claims Program, a Settlement Class Member does not release or prejudice his/her right to seek recovery for any Consequential Damages outside the context of this Settlement and the Claims Program. Where Consequential Damages are sought, the Parties agree that Settlement Class Members shall be limited to compensatory damages only.... [GAF] retains all legal and factual defenses to any claim for Consequential Damages.
GAF created a call center to answer general questions from claimants about compensation under the settlement agreement. A worksheet used at the call center provided the following anticipated question and answer:
Question: Will compensation for damages include the removal and replacement of roofing felt, flashing, caulking, etc. and disposal of old shingles?
Answer: As spelled out in the Settlement Agreement, compensation is based on (among other things) the type of shingle, the number of Damaged squares, and the age of the shingles. Labor costs, for those Claimants entitled to them, are related to the cost to install new shingles only and do not include removal costs or costs associated with the repair or replacement of other roofing components (e.g., flashing, roofing felt, etc.). This is explained in more detail in the notice package.
In a letter to a Coleman claimant, GAF stated: "The warranty settlement is not based on the current cost to replace your roof. The costs of labor, tear-off, flashing, materials other than the shingles themselves, and other damages are not covered by the limited warranty."
On October 23, 1998, after National Union denied GAF's claims under the policy, GAF filed its complaint against National Union and other insurance companies.[4] Pursuant to the Uniform Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62, GAF sought a declaration that National Union wrongfully refused or disputed its obligation to pay GAF's defense costs and indemnify GAF in the underlying lawsuit. GAF also alleged that National Union breached its contract by refusing to defend and indemnify GAF, and acted in bad faith *652 by failing to conduct an adequate investigation of the underlying lawsuit.[5]
National Union filed a counterclaim against GAF and alleged that GAF (1) negligently and intentionally failed to disclose certain material facts when GAF submitted an application to National Union for excess insurance; (2) committed equitable fraud justifying rescission of the policy or reformation to exclude the Coleman claimants; and (3) violated the New Jersey Insurance Fraud Prevention Act (IFPA), N.J.S.A. 17:33A-1 to -30.
Pretrial discovery proceeded for several years with the assistance of a special discovery master. Jury selection commenced more than twelve years after GAF filed its complaint.[6] Judge Vincent LeBlon tried the case on twenty-three days from January to March 2010. At the close of all evidence the judge dismissed GAF's bad faith claim that National Union failed to adequately investigate the underlying lawsuit. The jury returned a verdict of no cause of action on the remaining claims and the judge entered a judgment dismissing the complaint and counterclaim.
National Union filed a motion for a new trial on its counterclaim, or alternatively, a judgment notwithstanding the verdict, and GAF filed a cross-motion for a new trial. The trial judge conducted oral argument and issued a written opinion denying both motions. After finding GAF's motion untimely, he noted that GAF's evidence had "serious credibility issues" and found that the jury's verdict did not constitute a miscarriage of justice under the law. He further stated:
Plaintiff argues that the jury's conclusion that GAF made no payment to the Coleman claimants other than for the costs of defective shingles was unsupported by the evidence. However, throughout the trial, Defendant repeatedly attacked the credibility of Plaintiff's evidence. In many cases, Plaintiff's own claim files demonstrated that the Coleman claimants did not receive enough to compensate for the replacement of all the shingles, let alone the damage to the other parts of the roof.
On appeal, GAF argues that the court erred by (1) imposing on GAF the burden of proving that the Coleman settlement encompassed damages to property other than GAF's own shingles; (2) issuing a spoliation charge regarding markings that were made on some of the claim files by GAF's reviewers; (3) allowing National Union to designate an expert witness shortly before trial, thereby truncating GAF's opportunity to rebut that defense expert; (4) partially dismissing GAF's bad faith claims at the close of the evidence; and (5) denying GAF's pretrial motion to amend the pleadings to include a separate "occurrence" policy issued by National Union. In support of its cross-appeal, National Union contends that the judge erred by denying its motion for a new trial because GAF violated the IFPA.

II.
We begin by addressing GAF's contention that the judge wrongfully required it to establish, as a prerequisite to coverage, that some of the money GAF paid to settle the underlying Coleman lawsuit compensated claimants for damage to property other than defective shingles. GAF asserts that the jury charge and verdict *653 sheet misapplied the law and maintains that by requiring it to prove payment for third-party property damage, the trial judge departed from the law of the case established in various pretrial rulings.

A.
We reject GAF's argument that, in the context of underlying mass tort claims and the applicable policy language, it does not have the burden to prove it paid for damage to third-party property. GAF asserts that it established a prima facie case of a covered loss under the policy by showing that it settled claims alleging potential damage to property other than GAF's shingles. We disagree.
"An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." Flomerfelt v. Cardiello, 202 N.J. 432, 441, 997 A.2d 991 (2010). Pursuant to its policy here, National Union agreed to
pay on behalf of the Insured that portion of the ultimate net loss in excess of the Retained Amounts ... which the Insured shall become legally obliged to pay as ... damages ... because of ... Property Damage ... caused by an occurrence to which this insurance applies[.]
The policy defined "property damage" as "physical injury to or destruction of tangible property," and defined "occurrence" as "an event, including continuous or repeated exposure to conditions, which result[s] in Personal Injury and Property Damage neither expected [n]or intended from the standpoint of the Insured." Pursuant to the own-product exclusion, the policy does not apply to
a. the Insured's products arising out of such products or any part of such products;
b. work performed by the Insured or on the Insured's behalf arising out of the work or any portion thereof, or out of material, parts or equipment furnished in connection therewith[.]
The parties agree that under the terms of the policy, unintended damage to third-party property, rather than damage to GAF's shingles, constitutes a covered loss.
When an insured seeks indemnification under a general comprehensive liability policy that contains an own-product exclusion, the insured must first establish that its claim is covered under the policy's insuring clause. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 249, 405 A.2d 788 (1979) (emphasis added) (stating that a claim must be "cognizable under the general grant of coverage in the first instance in order to constitute a claim `to which this insurance applies'"); Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co., 387 N.J.Super. 434, 441, 904 A.2d 754 (App. Div.2006) (stating that "if there was no coverage under the insuring clauses, there is no need to consider whether coverage is negated by the exclusions"); Newark Ins. Co. v. Acupac Packaging, Inc., 328 N.J.Super. 385, 400, 746 A.2d 47 (App.Div.2000) (requiring insured to prove third-party property damage to the jury before coverage would be afforded); Heldor Indus., Inc. v. Atl. Mut. Ins. Co., 229 N.J.Super. 390, 397, 551 A.2d 1001 (App.Div.1988) (holding that "there must first be a finding of physical damage to tangible property from which the consequential damages flow").
If the insured offers sufficient credible evidence to establish a prima facie loss within the coverage of the policy, the burden of proving that the loss falls within the exclusionary provisions of the policy shifts to the insurer. Kopp v. Newark Ins. Co., 204 N.J.Super. 415, 421, 499 A.2d 235 *654 (App.Div.1985); see also Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co., 406 N.J.Super. 524, 538, 968 A.2d 724 (App. Div.) (quoting S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J.Super. 592, 603-04, 909 A.2d 1156 (App.Div.2006), certif. denied, 189 N.J. 647, 917 A.2d 787 (2007)), certif. denied, 200 N.J. 209, 976 A.2d 385 (2009); Cobra Prods., Inc. v. Fed. Ins. Co., 317 N.J.Super. 392, 401, 722 A.2d 545 (App.Div.1998), certif. denied, 160 N.J. 89, 733 A.2d 494 (1999) (citing Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984)).
GAF argues that it did not have the burden to establish that it compensated the Coleman claimants for damage to their personal property. However, the cases on which GAF relies do not constitute reliable or persuasive authority. Moreover, "[n]o unpublished opinion shall constitute precedent or be binding on any court," and with limited exceptions, inapplicable here, "no unpublished opinion shall be cited by any court." R. 1:36-3; see Guido v. Duane Morris LLP, 202 N.J. 79, 91 n. 4, 995 A.2d 844 (2010); Acupac, supra, 328 N.J.Super. at 394 n. 4, 746 A.2d 47. Therefore, we reject GAF's unsupported argument in light of the established authority set forth above.
GAF further argues that National Union is obligated to indemnify it for the costs of the settlement because the Coleman claimants raised claims that the policy might have covered. We rejected this contention in Heldor, supra, 229 N.J.Super. at 398, 551 A.2d 1001, where the plaintiff argued that defendants "owed a duty to defend because [the claimant in the underlying case] stated a cause of action `which may potentially' come within the coverage provided by the policies." There, we held:
It is true that the general approach is that the carrier has a duty to defend whenever the underlying complaint alleges a basis for liability within the covenant to pay.
However, the dut[ies] to defend and indemnify are "closely related and ... neither duty exists except with respect to occurrences for which the policy provides coverage."
[Id. at 398-99, 551 A.2d 1001 (second alteration in original) (citations omitted) (quoting Hartford Accident & Indem. Co., supra, 98 N.J. at 22, 483 A.2d 402).]
In Heldor, we concluded that the insured was required to present proof of coverage before it could invoke the duty to indemnify. Id. at 399, 551 A.2d 1001. Here, GAF cannot establish a prima facie case of covered loss for purposes of indemnity[7] simply by demonstrating that the Coleman claimants alleged third-party property damage; rather, it must show that the underlying settlement actually included payment for such damages.
We envision that our holding today will affect how other class action lawsuits may be resolved. We note therefore that when deterioration of an insured's product is increasing and causing collateral damage to third-party property which would otherwise constitute a covered loss under its insurance policy, the insured need not wait for augmented damage before negotiating a settlement with class plaintiffs. In other words, under a policy that includes an own-product exclusion, the insured should not have to assume and calculate, against itself, damages that its own product may cause to third-party property to preserve the ability to seek coverage later in a *655 declaratory judgment lawsuit. Nor should the insured have to forego settlement and wait for additional deterioration. Such a state of affairs encourages neither a swift nor an economic resolution. When an insured knows, as GAF claims to have known here, that there is a likelihood of continuing third-party damage flowing from its own product that would constitute a covered loss under its insurance policy, it is incumbent upon the insured to articulate to a reasonable degree of certainty what portion of its overall damages constitute a covered loss. Acupac, supra, 328 N.J.Super. at 400, 746 A.2d 47. This can be accomplished either by direct evidence of payment for third-party damages or by competent testimony demonstrating that third-party losses were a reasonably likely consequence of damages to the insured's product.
Here, there is no reason to believe that the jury returned a verdict of no cause because it rejected GAF's evidence of payment for third-party damages. Nothing in the record indicates that GAF introduced such evidence. In fact, GAF's damages expert, Peter Vollmar, testified that there would have been no business reason for the claim files to detail non-shingle damage even where such damage actually occurred. He testified that payments for such third-party damage were included as part of the total settlement amount and were not separately broken down from the GAF shingle damage.

B.
GAF also contends that the final jury charge and verdict sheet misstated the law by placing the burden on GAF to show, as a prerequisite to coverage, that it made payments that fell outside the own-product exclusion.
"`A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case.'" Viscik v. Fowler Equip. Co., 173 N.J. 1, 18, 800 A.2d 826 (2002) (quoting Rendine v. Pantzer, 276 N.J.Super. 398, 431, 648 A.2d 223 (App. Div.1994), aff'd as modified, 141 N.J. 292, 661 A.2d 1202 (1995)).
We see no error in the charge given by the judge, which sufficiently expressed the essence of these legal principles. The charge adequately conveyed the law to the jury, did not mislead or confuse, and did not prejudice substantial rights. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418, 690 A.2d 575 (1997); Zappasodi v. State, Dep't of Corr., 335 N.J.Super. 83, 89, 761 A.2d 96 (App.Div.2000). The judge instructed the jury:
GAF has the initial burden of proof to establish by a preponderance of the evidence [that] the amounts it incurred in paying the customers under the Coleman settlement agreement fall within the basic coverage under the insurance policy. GAF must prove by a preponderance of the evidence that it first had a legal obligation to pay sums of damages to the property of others, other than the plaintiff's own product, in this case, GAF's shingles.
....
[P]roperty damage does not include, first, the cost of the [sic] GAF's defective shingles and the labor costs to replace those shingles; or to [sic] the cost of replacing GAF's nondefective shingles that were damaged by the replacement of GAF's defective shingles. In other words, [the] claims-made policy does not cover GAF's shingles or the labor cost to replace those shingles.
If the preponderance of the evidence supports GAF's breach of contract and indemnity claims, then the defendant *656 has the burden of proving, by a preponderance of the evidence, what proportion of the money paid by GAF under the Coleman settlement agreement was paid to replace GAF's shingles. The cost of shingles and labor to replace shingles is not covered by the insurance policy in this case, so you may not award any damages for amounts paid by GAF to replace shingles.
....
[National Union] can be held liable only for those amounts, if any, paid to GAF customers for the costs of repairing and replacing other parts of their roofs besides its shingles, such as drip edges, flashing, gutters, ice and water barriers and underlayments....
The trial judge charged the jury consistent with the recognized principles of insurance coverage.
Moreover, we reject GAF's suggestion that the jury verdict sheet was inadequate. The first question on the verdict sheet asked:
Did GAF pay the Coleman claimants any money for physical injury to or destruction of tangible property ("property damage") other than the costs of GAF's shingles or labor for replacing GAF's shingles?
The question reflected the judge's instruction that GAF was first required to prove that it paid money to the Coleman claimants for property damage other than damage to the shingles themselves. Because the question was clear and adequately conveyed a correct statement of the law, Sons of Thunder, supra, 148 N.J. at 418, 690 A.2d 575, it is irrelevant that, as GAF contends, it did not permit the jury to find in GAF's favor based solely on a showing that GAF paid to resolve potential liabilities.

C.
Finally, we reject GAF's argument that the trial judge departed from the law of the case by charging the jury that GAF was required to demonstrate a covered loss as a prerequisite to coverage.
The law of the case doctrine is "a non-binding rule intended to prevent relitigation of a previously resolved issue." Lombardi v. Masso, 207 N.J. 517, 538, 25 A.3d 1080 (2011) (internal quotation marks omitted). The doctrine "`should be applied flexibly to serve the interests of justice.'" Bahrle v. Exxon Corp., 279 N.J.Super. 5, 21, 652 A.2d 178 (App.Div.1995) (quoting State v. Reldan, 100 N.J. 187, 205, 495 A.2d 76 (1985)), aff'd, 145 N.J. 144, 678 A.2d 225 (1996).
In 2003, Judge Alexander P. Waugh, Jr., who presided over the case at an earlier stage, issued a written opinion denying the parties' cross-motions for summary judgment. National Union had contended that the own-product exclusion defeated GAF's claims for indemnification. Judge Waugh reviewed Weedo, supra, 81 N.J. at 240-41, 405 A.2d 788, Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc., 343 N.J.Super. 430, 437-53, 778 A.2d 1132 (App.Div.), certif. denied, 170 N.J. 390, 788 A.2d 774 (2001), Acupac, supra, 328 N.J.Super. at 400-02, 746 A.2d 47, and Heldor, supra, 229 N.J.Super. at 396, 551 A.2d 1001, and concluded that GAF might be entitled to indemnification for settlement costs if it could establish that the defective shingles actually caused damage to flashing, underlayments, gutters, drip edges, and ice and water barriers, or that such items would necessarily be damaged when the defective shingles were replaced. He held that GAF "may, depending upon the facts developed through discovery, be able to prove an entitlement to some indemnification for the costs associated with the repair and/or replacement of [other roofing components]." *657 Judge Waugh's decision determined GAF's obligation, consistent with the principles enunciated in Weedo, Heldor, Acupac, and Firemen's Ins., to establish third-party property damage as a prerequisite to recovery.
Judge Waugh's decision was accepted as the law of the case for more than six years. National Union then renewed its summary judgment motion regarding the application of the own-product exclusion. In 2009, Judge Phillip Lewis Paley, who by that time had assumed responsibility for the case, issued a written opinion, denied the motion, and stated:
The insurers bear the burden to prove that an exclusion applies and to what extent. Wakefern [], [supra, 406 N.J.Super. at] 538 [968 A.2d 724].... Once a prima facie showing of damage covered by the policy is made, the burden shifts to the insurers to show what portion of the damages are excluded. Kopp [], supra, [204 N.J.Super.] at 421 [499 A.2d 235].[[8]]
[(Emphasis added).]
He recognized Judge Waugh's earlier decision that GAF was required to make a prima facie showing of claims covered, and acknowledged that National Union then bore the burden to show what part of the underlying settlement was excluded.
We therefore reject GAF's contention that the final jury charge departed from Judge Paley's ruling. Furthermore, even if Judge Paley's opinion changed the law of the case, the trial judge would not have abused his discretion by following the correct statement of the law enunciated by Judge Waugh. Bahrle, supra, 279 N.J.Super. at 21, 652 A.2d 178.

III.
GAF asserts that the trial judge erred by issuing an adverse inference charge concerning its damages after it became known that GAF's Executive Director of Customer Care and Warranty Service, Peter Vollmar, and his staff, altered original claim files, cumulatively increasing GAF's alleged damages. GAF maintains that the instruction was unwarranted, tainted its presentation of evidence, and that the judge's comments constituted reversible error.

A.
In November 2009, GAF delivered 22,-000 original Coleman claim files to the courthouse. Vollmar and several members of his staff reviewed the files and prepared an exhibit summarizing payments made for each claimant. GAF produced the 387-page exhibit during the trial, four days before Vollmar began his testimony. On direct examination, he testified that the summary exhibit represented settlement payments that GAF made by check or coupon for replacement shingles.
On cross-examination, however, Vollmar admitted that he and his team wrote on unredeemed coupons,[9] filled in cash values as if claimants had redeemed the coupons, and then added those values to the summary sheet. Vollmar testified that once he understood that altering the files was improper, "we reported it immediately to the judge." Later in his testimony, Vollmar *658 repeated that "we" brought the alteration of the files to the judge's attention. In fact, neither GAF nor Vollmar notified the judge.
"Spoliation, as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing." Rosenblit v. Zimmerman, 166 N.J. 391, 400, 766 A.2d 749 (2001) (citing Black's Law Dictionary 1409 (7th ed. 1999)). "In law, it is the term that is used to describe the hiding or destroying of litigation evidence, generally by an adverse party." Id. at 400-01, 766 A.2d 749 (citing Bart S. Wilhoit, Comment, Spoliation of Evidence: The Viability of Four Emerging Torts, 46 UCLA L.Rev. 631, 633 (1998)). A duty to preserve evidence "arises when there is pending or likely litigation between two parties, knowledge of this fact by the alleged spoliating party, evidence relevant to the litigation, and foreseeability that the opposing party would be prejudiced by the destruction or disposal of this evidence." Cockerline v. Menendez, 411 N.J.Super. 596, 620, 988 A.2d 575 (App.Div.) (citing Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J.Super. 358, 366, 707 A.2d 180 (App.Div. 1998)), certif. denied, 201 N.J. 499, 992 A.2d 793 (2010).
There are various ways to address spoliation of evidence. The judge may give a jury charge of adverse inference or order discovery sanctions, or a party may bring a new cause of action based on the tort of fraudulent concealment. See generally Robertet Flavors, Inc. v. Tri-Form Constr., Inc., 203 N.J. 252, 272-74, 1 A.3d 658 (2010); Rosenblit, supra, 166 N.J. at 401-07, 766 A.2d 749. The remedies are intended "to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct." Rosenblit, supra, 166 N.J. at 401, 766 A.2d 749 (citing Steffen Nolte, The Spoliation Tort: An Approach to Underlying Principles, 26 St. Mary's L.J. 351, 355-56 (1995)); see also Robertet Flavors, supra, 203 N.J. at 273-74, 1 A.3d 658 (discussing how to choose an appropriate remedy for spoliation). "The selection of the appropriate sanction is left to the trial court's discretion and will not be disturbed if it is just and reasonable in the circumstances." Cockerline, supra, 411 N.J.Super. at 620-21, 988 A.2d 575 (internal quotation marks omitted).
An adverse inference charge balances the equities, in that the factfinder is permitted to presume that the evidence the spoliator destroyed or concealed would have been unfavorable to him or her. Robertet Flavors, supra, 203 N.J. at 273, 1 A.3d 658; Rosenblit, supra, 166 N.J. at 401-02, 766 A.2d 749. The instruction can be used properly even when the spoliation was not willful. Jerista v. Murray, 185 N.J. 175, 202, 883 A.2d 350 (2005). When the duty to preserve evidence is violated, the party is responsible regardless of whether the spoliation occurred because of intentional or negligent conduct. Imet Mason Contractors, supra, 309 N.J.Super. at 368, 707 A.2d 180.
In the final charge, the judge stated to the jury:
I also wanted, in terms of evidence, to comment on ... one of the issues that was raised during the course of the trial, and that was what we referred to as spoliation of evidence. Spoliation of evidence is the improper alteration or destruction of documents or information that is going to be used as evidence in a case. Here the plaintiff's witness, Mr. Peter Vollmar, testified that in the course of preparing the summary exhibit, Plaintiff's Exhibit 14 and 14-A, the team under Mr. Vollmar's supervision *659 added information to the claim files from which the summary exhibit was allegedly compiled.
He also testified that he intended to remove all of the unredeemed coupons from the summary document and that he did not believe doing the mathematical calculations on the unredeemed coupon [sic] was improper.
The defendant's expert, Mr. Neumann, testified that he and his team discovered some of these alterations when they compared approximately 4,000 above warranty claim files that they had reviewed with some of the claim files that the plaintiff brought to my courtroom back in November of 2009. Mr. Neumann also testified that he could only compare a limited number of the above warranty claim files that he reviewed with Plaintiff's Exhibit 14 and 14-A to determine if the files were altered and to what extent, given the time frame in which the Plaintiff's Exhibit 14 and 14-A was produced, and ... these changes were discovered.
....
Mr. Vollmar and his team should not have written on any files. By altering the files, the plaintiff, under the direction of Mr. Vollmar, has engaged in what is legally known as spoliation of evidence. You may consider the fact that Mr. Vollmar testified that he or the plaintiff had advised the court of these alterations, which I have told you is not true. Accordingly, under the law you may infer that the plaintiff made changes to the files, because otherwise those files would not support their claims against the defendant. You should assess such, any such inference in context of Mr. Vollmar's overall testimony, his demeanor and credibility on the witness stand.
[(Emphasis added).]

B.
GAF contends that the adverse inference charge was unwarranted because the evidence was neither destroyed nor materially altered. However, by randomly placing altered files among tens of thousands of unaltered files spread over more than four hundred boxes, GAF effectively concealed or materially altered the evidence.
Although spoliation most often arises in the context of destroyed evidence, it is equally applicable to situations where evidence has been concealed or materially altered. See Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 116-19, 961 A.2d 1167 (2008) (discussing the history of spoliation in our case law). The key in any situation is the effect the spoliator's actions had on the aggrieved party's ability to present its case. Ibid.
Here, GAF's summary exhibit, produced in the middle of trial, listed $13 million in damages in excess of the calculation referenced in the opening statement of GAF's counsel and that which had been stated in interrogatories and other pretrial disclosures. During his trial testimony, Vollmar revealed changes that reduced the damages listed in the summary exhibit by $2 million. Because of court closings due to snowstorms, intervening holidays, and weekends, the defense expert, Kenneth Neumann, had limited time to compare Vollmar's summary exhibit with the original claim files. Nonetheless, Neumann and his staff found discrepancies in the exhibit by reviewing 4,000 files that GAF had previously produced.
Although GAF argues that Vollmar later removed all but 11 of the 300 altered files, there was insufficient time for Neumann to determine if he had identified all the alterations. In fact, there were 18,000 claim *660 files Neumann could not check, thereby limiting National Union's ability to rebut Vollmar's summary document. Under the circumstances, the judge did not abuse his discretion by giving the adverse inference charge.

C.
Next, GAF asserts that the spoliation instruction tainted its presentation of evidence by casting GAF as an untrustworthy litigant willing to destroy evidence and lie to the jury in order to advance its position. GAF claims that the instruction not only tainted Vollmar's summary exhibit, but also broadly encouraged the jury to disbelieve every witness and piece of evidence GAF presented. It contends that the jury returned a verdict of no cause of action based on an improper and unwarranted spoliation inference, rather than an evaluation of the nature of the claims and payments.
This argument is purely speculative. Vollmar testified that he and his team wrote on evidence because they did not know they were not allowed to do so. The jury listened to his testimony and was free to accept or reject it. We presume that the jury followed the judge's instructions. Windmere, Inc. v. Int'l Ins. Co., 208 N.J.Super. 697, 715, 506 A.2d 834 (App.Div.1986) (citing State v. Manley, 54 N.J. 259, 271, 255 A.2d 193 (1969)), aff'd, 105 N.J. 373, 522 A.2d 405 (1987).

D.
Finally, GAF maintains that the judge committed reversible error by telling the jury, "You may consider the fact that Mr. Vollmar testified that he or the plaintiff had advised the court of these alterations, which I have told you is not true." Although the judge's instruction could have been more circumspect, it was GAF and its witness that put the judge into a position of having to correct an inaccurate statement referring personally to the judge and his purported role in the dispute.
When commenting on the evidence, a judge must "use great care that an expression of an opinion upon the evidence should be given so as not to mislead the jury; deductions and conclusions not warranted by the evidence should be studiously avoided." Vill. of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 128-29, 145 A.2d 306 (1958). A judge may not assume the role of a witness, Hare v. Pennell, 37 N.J.Super. 558, 567, 117 A.2d 637 (App. Div.1955), nor make improper comments on witness credibility, Morie v. N.J. Mfrs. Indem. Ins. Co., 48 N.J.Super. 70, 83, 137 A.2d 41 (App.Div.1957). Nevertheless, a "judge has broad discretion to refer to specific evidence in his charge." Navarro v. George Koch & Sons, Inc., 211 N.J.Super. 558, 570, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986). In fact, a "judge may comment on the evidence and has the duty to do so, so long as it is to assist and not control the findings of the jury." Id. at 570-71, 512 A.2d 507.
Here, the trial judge did not impose a personal opinion, misrepresent the facts, or attempt to control the findings of the jury. Vollmar stated that "we reported it immediately to the judge" and "[w]e brought it to the attention of the judge." Judicial comment on the inaccuracy of these statements was not improper.

IV.
GAF contends that the court erred by allowing National Union to designate Neumann as a defense expert witness shortly before trial, thereby truncating GAF's opportunity to rebut that defense expert.

*661 A.
We begin by providing the pertinent procedural history. The litigation in this case spanned approximately twelve years and involved at least four judges and one special discovery master (SDM). The court appointed the SDM in March 2001. Before he was appointed, the SDM met with the parties and reviewed the status of outstanding discovery. From February 2001 to June 2009, the SDM managed the parties' discovery obligations and entered several case management orders.
Following Judge Waugh's 2003 order denying the parties' summary judgment motions, National Union sought discovery of all non-privileged documents pertaining to GAF's proof of actual covered losses. In 2003, because GAF failed to produce discovery relating to the Coleman claims, the SDM compelled GAF to produce the information. Despite several additional conferences and motions to compel, GAF did not comply adequately.
In November 2005, the judge ordered that fact discovery be closed on January 17, 2006, required GAF to serve expert reports by January 31, 2006, required the parties to complete the depositions of experts by June 30, 2006, and set a trial date for September 11, 2006. Although National Union allowed GAF additional time to respond, GAF failed to produce responsive discovery, including expert reports. In March 2006, National Union moved to dismiss the complaint without prejudice.
On April 3, 2006, the SDM denied the motion to dismiss and recommended that the court impose nine sanctions against GAF, including that "[GAF] having failed to file any expert's reports by January 31, 2006 is precluded from offering any expert report or testimony at trial." On April 4, 2006, the SDM amended his recommendations and added that "the Defendant Insurers are relieved from filing their expert reports on March 31, 2006 ... until further Order of the Court."
On August 11, 2006, the SDM allowed GAF to produce an April 19, 2006 report from its expert, Don Erwin, "subject to the limitation that [GAF] may not file an expert report on its affirmative case from any new expert." The SDM further allowed GAF to file a supplemental expert report no later than September 15, 2006.
After the court adjourned the 2006 trial date, Judge Waugh extended the time for GAF to comply with additional discovery orders, and noted that "[t]he Defendants' point, that [GAF] should be able to articulate its damage claims after eight years of litigation, is well taken." Despite additional case management orders and conferences, deposition of several of GAF's witnesses remained outstanding.
On June 19, 2009, Judge James P. Hurley, who was then handling the matter, rescheduled the trial date for September 21, 2009, "with no further adjournments... without a showing of exceptional and unforeseen circumstances." Judge Hurley authorized the SDM to enter directives addressing additional discovery "so long as any such directive will not affect the trial date."
On June 23, 2009, the parties appeared before the SDM to address GAF's requests to amend Erwin's report and to add a new expert to provide testimony concerning insurance coverage. The SDM denied GAF's request for a new expert and stated that he would review the proposed amendments before deciding whether an amendment would be appropriate.
In July 2009, GAF filed a motion to vacate the SDM's decision, and National Union cross-moved requesting that the court set a date certain for it to serve its defense expert reports. Judge Hurley denied GAF's request to amend Erwin's report, *662 denied GAF's request to add a new expert, and ordered National Union to serve its expert report by August 31, 2009.
On August 31, 2009, National Union served Neumann's report. On September 4, 2009, GAF filed a motion to strike the report and bar Neumann's testimony at trial. Judge LeBlon denied GAF's motion and required Neumann to provide GAF's counsel with the file materials on which he relied.

B.
We reject GAF's argument that Judge LeBlon erred by allowing National Union to designate Neumann as its expert. A trial court's decision on discovery matters is reviewed under an abuse of discretion standard. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371, 25 A.3d 221 (2011) (citing Bender v. Adelson, 187 N.J. 411, 428, 901 A.2d 907 (2006)). "That is, `[w]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law.'" Ibid. (alteration in original) (quoting Rivers v. LSC P'ship, 378 N.J.Super. 68, 80, 874 A.2d 597 (App.Div.), certif. denied, 185 N.J. 296, 884 A.2d 1266 (2005)). We see no abuse of discretion here.
In 2006, after GAF's failure to produce relevant documentation of the Coleman claims and years of repeated discovery violations, the SDM recommended nine sanctions against GAF, including barring GAF from offering an expert report, and relieved National Union of serving its expert report "until further order of the court." Even then, the SDM allowed GAF to produce Erwin's report and supplement the report by September 15, 2006. GAF failed to avail itself of the opportunity and allowed the deadline to pass. After denying GAF's request on the eve of trial to add an expert and supplement Erwin's report, the judge selected a date before trial for National Union to serve its expert report, and allowed its expert to respond to Erwin's opinions. The judge did not abuse his discretion.

C.
Next, we also reject GAF's contention that the judge truncated its ability to rebut the Neumann report. GAF did not demonstrate any credible reason to extend discovery pursuant to Rule 4:24-1(c), which states in pertinent part:
The parties may consent to extend the time for discovery for an additional 60 days by stipulation.... [If] a longer extension is sought, a motion for relief shall be filed ... and made returnable prior to the conclusion of the applicable discovery period.... On restoration of a pleading dismissed pursuant to [Rule] 1:13-7 or [Rule] 4:23-5(a)(1) or if good cause is otherwise shown, the court shall enter an order extending discovery.... No extension of the discovery period may be permitted after an arbitration or trial date is fixed, unless exceptional circumstances are shown.
At the conference before the SDM on June 23, 2009, GAF requested an extension of discovery, for which it needed to show exceptional circumstances because a trial date had been set.
In Rivers, supra, 378 N.J.Super. at 78-79, 874 A.2d 597, the court observed that exceptional circumstances generally denote something unusual or remarkable. The moving party must demonstrate counsel's diligence in pursuing discovery, establish the essential nature of the discovery sought, explain counsel's failure to request an extension within the original time period, and show that the circumstances presented were clearly beyond counsel's control. *663 Id. at 79, 874 A.2d 597. "[W]here the `delay rests squarely on plaintiff's counsel's failure to retain an expert and pursue discovery in a timely manner,' and the [above] factors are not present, there are no exceptional circumstances to warrant an extension." Ibid. (quoting Huszar v. Greate Bay Hotel & Casino, Inc., 375 N.J.Super. 463, 473-74, 868 A.2d 364 (App. Div.), remanded on other grounds, 185 N.J. 290, 884 A.2d 1262 (2005)).
Judge Hurley did not use the exceptional circumstances test set forth in Rivers, but rather applied the more lenient "good cause" standard. In Tynes ex rel. Harris v. St. Peter's University Medical Center, 408 N.J.Super. 159, 168, 973 A.2d 993 (App.Div.), certif. denied, 200 N.J. 502, 983 A.2d 1110 (2009), we held that under Rule 4:24-1(c) "[t]he `good cause' standard applies to motions to extend discovery unless an arbitration or trial date is fixed." We noted that "good cause" is a "flexible term" without a fixed or definite meaning, id. at 169, 973 A.2d 993, and set forth the following factors to consider when evaluating whether good cause exists:
(1) the movant's reasons for the requested extension of discovery;
(2) the movant's diligence in earlier pursuing discovery;
(3) the type and nature of the case, including any unique factual issues which may give rise to discovery problems;
(4) any prejudice which would inure to the individual movant if an extension is denied;
(5) whether granting the application would be consistent with the goals and aims of "Best Practices";
(6) the age of the case and whether an arbitration date or trial date has been established;
(7) the type and extent of discovery that remains to be completed;
(8) any prejudice which may inure to the non-moving party if an extension is granted; and
(9) what motions have been heard and decided by the court to date.
[Id. at 169-70, 973 A.2d 993 (quoting Leitner v. Toms River Reg'l Sch., 392 N.J.Super. 80, 87-88, 919 A.2d 899 (App. Div.2007)).]
Judge Hurley considered the Tynes factors and determined that good cause did not exist to extend discovery. He determined that an extension might delay the pending trial date; the case had been in discovery for over ten years; the information GAF sought to supplement had been available for at least six years; the injection of new material into the case at such a late date would prejudice National Union; and there had been at least thirty-nine motions before the court.
There is sufficient evidence in the record to support each of the judge's findings on the Tynes factors. Indeed, just as in Tynes,
[i]f plaintiffs are deemed to have established "good cause" in this case, notwithstanding the length of time in which this matter has been pending, the many discovery extensions previously granted by the trial court[,] and plaintiffs' failure to complete discovery by the prescribed discovery end date, the "good cause" standard would have little efficacy.
[Id. at 173, 973 A.2d 993.]
Because plaintiff failed to show good causelet alone exceptional circumstancesto extend discovery, Judge Hurley did not abuse his discretion in denying GAF's motions to amend Erwin's report and appoint a new expert.

D.
Finally, GAF was not prejudiced.[10] It possessed Neumann's report *664 for a sufficient amount of time and had access to the claim information he used in the report. GAF's counsel cross-examined Neumann on two days during a N.J.R.E. 104(a) hearing. After GAF determined that it would not produce Erwin as a trial witness, the judge allowed GAF, one month before the trial began, to add two undesignated lay witnesses to rebut many of Neumann's conclusions.[11]

V.
We have considered the balance of GAF's contentions, including its assertion that Judge LeBlon erred by dismissing its claim that National Union failed to conduct a good faith investigation[12] and denying its late motion to amend, and have determined that those arguments lack sufficient merit to address in this written opinion. R. 2:11-3(e)(1)(E). We add the following comments.
*665 The jury heard GAF's arguments concerning undue delay, received proper instructions from the court, and doubtless would have considered the merits of the bad faith claim if it had not concluded that GAF did not suffer a covered loss. In initially dismissing GAF's bad faith claim pursuant to Rule 4:37-2(b), Judge LeBlon stated:
Giving [GAF] the benefit of all reasonable inferences, I find that there is not sufficient proofs to put the matter before the jury, I'm going to grant that motion. I'm not going to put the issue of failure to investigate before the jury. I believe that, ... the notice to [National Union] was not sufficient as a matter of law[.][[13]]
Later, the judge clarified his ruling by informing GAF's counsel that counsel could argue failure to investigate in the context of a breach of good faith and fair dealing because the judge and GAF's counsel agreed that "the delay is the same as the inadequate investigation, because... the delay was the cause of the inadequate investigation." GAF's counsel, in her closing statement, referred repeatedly to National Union's failure to conduct a timely and thorough investigation.
The judge then instructed the jury concerning GAF's burden of proof on its claim that National Union breached the covenant of good faith and fair dealing by not paying claims that were actually covered under the policy. In addressing GAF's claim that National Union acted in bad faith by not responding to notice of the Coleman class action for eighteen months or longer, the judge charged the jury, in part:
GAF must prove ... that [National Union] did not respond to that notice in a reasonable time period ... [and] had no reasonable basis for failing to respond to that notice in a reasonable time period.
GAF also fails to explain how damages incurred from National Union's failure to investigate differed from damages incurred because of defendant's delay.
Regarding GAF's argument that the court erred by denying its pretrial motion to amend the pleadings to add additional claims under a National Union commercial umbrella policy (the occurrence policy), Judge Paley issued a written opinion dated August 17, 2009, with which we substantially agree. The judge stated:
This proposed amendment will prejudice the defense by adding an additional ... policy ... with little or no notice[.] The end for discovery occurred years ago. Liberality in dealing with applications to amend complaints is not unlimited....
[I]t is inconceivable that the requested amendment would not result in delay. With only limited factual underpinnings to the claim, it is hardly likely that defendants would not seek, and be entitled to, discovery. 2009 is too late for an amendment to a 1998 complaint. The application to amend the complaint is denied.
*666 In general, courts should liberally grant motions for leave to amend regardless of the stage of the proceedings and without consideration of the ultimate merits of the amendment. Pressler & Verniero, Current N.J. Court Rules, comment 2.1 on R. 4:9-1 (2012). "Nevertheless[,] amendment remains a matter addressed to the court's sound discretion." Id. at comment 2.2.1 on R. 4:9-1; Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 457, 713 A.2d 411 (1998). We may sustain an exercise of discretion where a trial court refuses to permit a party to add new claims late in the litigation because doing so would prejudicially affect the other party's rights. Fisher v. Yates, 270 N.J.Super. 458, 467, 637 A.2d 546 (App.Div.1994) (citing Du-Wel Prods. v. U.S. Fire Ins. Co., 236 N.J.Super. 349, 364, 565 A.2d 1113 (App.Div.1989), certif. denied, 121 N.J. 617, 583 A.2d 316 (1990)).
Indeed, the factual situation in each case must guide the court's discretion. Bonczek v. Carter-Wallace, Inc., 304 N.J.Super. 593, 602, 701 A.2d 742 (App. Div.1997), certif. denied, 153 N.J. 51, 707 A.2d 154 (1998). One circumstance to consider is the reason for the late filing. Verni ex rel. Burstein v. Harry M. Stevens, Inc. of N.J., 387 N.J.Super. 160, 196, 903 A.2d 475 (App.Div.2006), certif. denied, 189 N.J. 429, 915 A.2d 1052 (2007). Other considerations include whether the newly-asserted claim would unduly prejudice the opposing party, survive a motion to dismiss on the merits, cause undue delay of the trial, or constitute an effort to avoid another applicable rule of law. Kimmel v. Dayrit, 154 N.J. 337, 343, 712 A.2d 1129 (1998).
Here, GAF offered no reason other than "inadvertence" for its failure to include the occurrence policy among the scores of policies added in the fourth amended complaint. It did not reveal when this inadvertence was discovered, nor did it explain why it did not move to amend the complaint sooner. Given that an insurer may be obligated to indemnify claims accruing under an occurrence policy pursuant to a continuous trigger theory, see, e.g., Ply Gem, supra, 343 N.J.Super. at 452-62, 778 A.2d 1132, National Union would have been significantly prejudiced if denied the opportunity to conduct discovery and review relevant claims. Moreover, it is highly likely that adding a new cause of action to the complaint in August 2009 would have delayed the September 2009 trial date.

VI.
We turn briefly now to National Union's cross-appeal. National Union contends that the trial judge erred in denying its motion for a new trial on its IFPA counterclaim because the only conclusion from the evidence is that GAF lied when it represented to National Union that it would not submit shingle claims under the policy. To support its counterclaim, National Union relied on the testimony of Patricia Hindle, National Union's underwriter, who testified that GAF knowingly made false written and oral statements in order to obtain the policy. There was, however, sufficient evidence elicited at trial that supported a contrary view.
The IFPA interdicts a broad range of fraudulent conduct. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 172, 892 A.2d 1240 (2006). A "person or practitioner" violates the IFPA if he or she
[p]repares or makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining:
....
(b) an insurance policy, knowing that the statement contains any false or misleading *667 information concerning any fact or thing material to an insurance application or contract[.]
[N.J.S.A. 17:33A-4(a)(4).]
An insurance company damaged as the result of a violation of any provision of the IFPA may sue therefore in any court of competent jurisdiction to recover compensatory damages. N.J.S.A. 17:33A-7(a).
In order to accomplish its purpose of deterring insurance fraud, the IFPA requires insurers who allege violations to prove fewer elements than required for common law fraud. Land, supra, 186 N.J. at 174-75, 892 A.2d 1240. Significantly, "the statutory language of IFPA does not require proof of reliance on a false statement or resultant damages." Id. at 175, 892 A.2d 1240; Merin v. Maglaki, 126 N.J. 430, 445, 599 A.2d 1256 (1992).
A trial court's ruling on a motion for a new trial "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski v. Burke, 380 N.J.Super. 361, 391, 882 A.2d 410 (App. Div.2005), certif. denied, 186 N.J. 242, 892 A.2d 1288 (2006). Thus, "[j]ury verdicts should be set aside in favor of new trials only with great reluctance, and only in cases of clear injustice." Ibid.
Here, the judge charged the elements of the IFPA claim and stated:
To prevail on this claim, National Union must prove by a preponderance of the evidence that National Union was damaged as a result of a violation by GAF of either of the following:
First, that it prepared or made any written or oral statement intended to be presented to National Union to obtain an insurance policy, knowing that the statement contained any false or misleading information concerning any fact or thing material to an insurance application for contract;
Or that it concealed or knowingly failed to disclose any evidence, written or oral, which may be relevant to a finding that a violation of the above has or has not occurred.[[14]]
*668 Judge LeBlon concluded that whether National Union had proved that GAF knowingly misled Hindle was a question for the jury to determine. The judge properly found that the jury's verdict did not constitute a miscarriage of justice under the law.
Hindle testified that Robert Flugger, GAF's former Director of Risk Management, and Tom Coughlin, GAF's insurance broker, told her that shingle claims would not be submitted for payment pursuant to the policy. She maintained that National Union would not have issued the policy if she had been told that shingle claims would be made under the policy or if forty-three pending claims listed in an exhibit prepared by Neumann had been disclosed on the policy application.
A portion of Flugger's deposition from another trial, which had been read to the jury, suggested that GAF may not have concealed any information. Flugger stated that during the underwriting of the policy he did not discuss with Hindle the scope of coverage the policy afforded, what he expected the policy to cover, or any roofing claims with respect to the policy. He further explained that the warranty department normally handled complaints about shingles.
Further, under cross-examination, Hindle admitted that prior to preparing for trial, she had never reviewed the forty-three claim files, taken any steps to confirm the nature of the listed claims, or concluded that any one of them was individually significant. She also did not know if they were liability claims. Neumann testified that it would not surprise him that at least thirty-nine of the forty-three claims were actually warranty claims and not pending litigation.
The effect of Flugger's deposition, Hindle's admissions on cross-examination, and Neumann's testimony was to cast doubt on Hindle's direct testimony regarding the shingle-related claims. The jury could have concluded that the claims were warranty losses and not liability claims, and could have rejected Hindle's testimony as to the discussions she had with Flugger and Coughlin.
Although National Union contends that Hindle's testimony was unrefuted, a jury need not always accept uncontested proofs. "[S]imply because proofs are undisputed is insufficient in and of itself to warrant the grant of a motion for judgment ... in situations in which credibility is at issue, since the fact-finder is free to reject those uncontested proofs on credibility grounds." Johnson v. Salem Corp., 97 N.J. 78, 92, 477 A.2d 1246 (1984). "Where [people] of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury." Sons of Thunder, supra, 148 N.J. at 415, 690 A.2d 575 (quoting Ferdinand v. Agric. Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494, 126 A.2d 323 (1956)). "[W]hen the result of the contest must turn on the truthfulness of witnesses, the superior advantage of the trial judge in seeing and hearing and appraising the disputants must ordinarily be regarded as the fulcrum on which the issue should be resolved." Abeles v. Adams Eng'g Co., 35 N.J. 411, 423-24, 173 A.2d 246 (1961). Here, the jury considered Hindle's demeanor and rejected her testimony, and it *669 does not clearly appear that there was a miscarriage of justice under the law.
We have considered the remaining arguments raised by National Union and have determined that they lack sufficient merit to address in this written opinion. R. 2:11-3(e)(1)(E).
Affirmed on the appeal and cross-appeal.
NOTES
[1] Coleman v. GAF Bldg. Materials Corp., No. CV-96-0954 (Ala. Cir. Ct., Mobile Cty.).
[2] In addition to the Coleman litigation, numerous individual claims and at least four other class action lawsuits were filed against GAF alleging defective roof shingles. The non-Coleman claims included both residential and commercial roofing claims.
[3] Additionally, GAF offered many of the non-Coleman claimants the choice of accepting a settlement under GAF's limited warranty or receiving a settlement under the terms of the Coleman agreement.
[4] All defendants other than National Union have either settled or been dismissed and are not involved in this appeal.
[5] GAF later amended its complaint to include non-Coleman claims, and GAF added various additional insurance companies as parties, none of whom are involved in this appeal.
[6] GAF voluntarily dismissed with prejudice the non-Coleman claims during jury selection.
[7] Our discussion is confined to indemnity, not the duty to defend. See Abouzaid v. Mansard Gardens Assocs., LLC, 207 N.J. 67, 79-81, 23 A.3d 338 (2011) (reviewing basic principles of insurer's duty to defend).
[8] In the same opinion, Judge Paley also concluded, "The carriers must prove what portion of GAF's defense costs relate to non-covered claims and must pay the full costs of the defense if they cannot do so." This statement generally supports his earlier comment that National Union bears the burden of proof once a prima facie showing is made.
[9] An unredeemed coupon in the claim file meant that GAF had not incurred the costs reflected by that coupon.
[10] In a post-argument submission dated February 28, 2012, GAF relies on an unpublished opinion, pursuant to Rule 2:6-11(d), to argue that it was unfairly prejudiced because "Neumann opined for the first time at trial that GAF paid only 26% of the costs to replace the underlying claimants' roofsallegedly less than the costs of the defective shingles." This contention, which was not made in GAF's merits briefs, need not be considered. In any event, the claim of prejudice is unavailing. No objection to this portion of the testimony was made at trial. The absence of a timely objection suggests that GAF's trial counsel did not feel ambushed by the twenty-six percent reference. See Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 523, 20 A.3d 1123 (2011). "Where defense counsel has not objected, we generally will not reverse unless plain error is shown." Jackowitz v. Lang, 408 N.J.Super. 495, 505, 975 A.2d 531 (App.Div. 2009) (citing R. 2:10-2). Moreover, although Neumann's expert report does not explicitly make the percentage reference calculation, the underlying data supporting the calculation was contained in the report. GAF had ample opportunity to anticipate that this simple calculation from this disclosed data could have been noted by Neumann during his testimony. Thus, even aside from the fact that the unpublished opinion has no precedential value, R. 1:36-3, the circumstances of that case are fundamentally different from those presented here.
[11] James McDermott testified about the steps involved in constructing a roof, the role of the various roofing components, the roofing products offered by GAF, and the relative complaint rates for GAF shingles. Christopher Mooney described a typical warranty inspection, the costs of repair work, and the damages usually incurred in tearing off existing shingles. He estimated that forty-seven percent of the cost of repairing and replacing an entire roof was for items other than the shingles themselves. Vollmar testified that the total amount expended under the Coleman settlement was $61,476,684, enabling GAF to argue that it was entitled to indemnification for forty-seven percent of that amount.
[12] Because GAF failed to establish the existence of a covered loss, we need not address the merits of its bad faith claim. See Pickett v. Lloyd's, 131 N.J. 457, 473, 621 A.2d 445 (1993) (observing that a claim for bad faith refusal to pay is not sustainable if insured cannot establish coverage); Universal-Rundle Corp. v. Commercial Union Ins. Co., 319 N.J.Super. 223, 249-51, 725 A.2d 76 (App. Div.) (applying the holding in Pickett to claim for bad faith failure to conduct thorough investigation), certif. denied, 161 N.J. 149, 735 A.2d 574 (1999).

Moreover, although it asserted that "the evidence at trial ... would have fully supported a jury's conclusion [that National Union had a duty to investigate]," GAF did not provide references to testimony in the record. R. 2:6-8. Likewise, GAF contended that "the evidence at trial showed that National Union had received a similar notice in another action and had immediately opened a file." However, GAF did not explain how this contention would support its bad faith claim. It is not the appellate court's duty to search the record to substantiate plaintiff's argument. 700 Highway 33 LLC v. Pollio, 421 N.J.Super. 231, 238, 23 A.3d 446 (App.Div.2011). An argument based on conclusory statements is insufficient to warrant appellate review. Nextel of N.Y. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J.Super. 22, 45, 824 A.2d 198 (App.Div.2003).
[13] The judge did not err in determining that GAF's notice of a claim was inadequate. The policy provided that "[i]mmediate notice must be given to the Insurer, whenever the Insured has information from which the Insured could reasonably conclude that a Claim or a Potential Claim, alone or in combination with other Claims or Potential Claims, may deplete the retained amounts by 25% or more."

GAF notified National Union in 1996 about the Coleman class action and promised to keep defendant fully informed regarding substantive matters surrounding the case. The notice did not set forth the policy under which GAF claimed coverage, and did not contain any representation concerning the $2 million retention limit. In fact, GAF never informed National Union that the Coleman claims had the potential to delete the retention by twenty-five percent.
[14] Although the court's charge on the elements of the IFPA claim correctly stated the law, Judge LeBlon prefaced the charge with an instruction that for each counterclaim, National Union needed to establish justifiable reliance in order to prevail. He stated, without any objection:

I will set forth more detail below, but National Union must prove, in addition to the elements I will instruct you for each of the counterclaims, that GAF, first, either did not tell the truth or omitted making certain disclosure; two, that National Union justifiably relied upon the information that GAF did provide; three, that those representations or omissions were material ...; and[,] four, that National Union was damaged by GAF's representations or omissions.
[(Emphasis added).]
A party who does not object to a jury instruction at trial waives the right to challenge the instruction on appeal. R. 1:7-2; State v. Afanador, 151 N.J. 41, 54, 697 A.2d 529 (1997). A reviewing court may reverse on the basis of unchallenged error in the jury charge only if it finds plain error clearly capable of producing an unjust result. R. 2:10-2; Harris v. Peridot Chem. (N.J.), Inc., 313 N.J.Super. 257, 296, 712 A.2d 1181 (App.Div.1998). "[R]elief under the plain error rule, at least in civil cases, is discretionary and should be sparingly employed." Gaido v. Weiser, 115 N.J. 310, 311, 558 A.2d 845 (1989) (internal quotation marks omitted).
On appeal, National Union did not argue that the judge erred by reading the prefatory language to the jury. When we notice an error not raised as an issue on appeal, we only grant relief where the interests of justice demand. White v. Katz, 261 N.J.Super. 672, 678, 619 A.2d 683 (App.Div.1993); see also 500 Columbia Tpk. Assocs. v. Haselmann, 275 N.J.Super. 166, 172, 645 A.2d 1210 (App.Div. 1994) (dismissing aspect of cross-appeal not supported by any argument in the briefs).
Here, the judge properly charged the jury on the elements of the IFPA and did not refer back to the perceived reliance requirement. For that reason, any error in the court's prefatory instruction or understanding of the law was harmless.