**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2630-19

STATE OF NEW JERSEY,
by the COMMISSIONER OF
TRANSPORTATION,

     Plaintiff-Respondent,

v.

ESTATE OF JAMES M. SALERNO,
deceased, his unknown heirs,
devisees and personal representatives,
and his, their or any, of their
successors in right, title and interest,
JAI BARANGI INVEST LIMITED
LIABILITY COMPANY, A New
Jersey Limited Liability Company,
UNITED STATES OF AMERICA,
STATE OF NEW JERSEY, and the
CITY OF JERSEY CITY, in the
County of Hudson, a Municipal
Corporation of New Jersey,

     Defendants,

and

976 NEWARK REALTY, LLC,

     Defendant-Appellant.

_____

Submitted February 10, 2021 – Decided March 16, 2021

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-0295-18.

McKirdy, Riskin, Olson & DellaPelle, PC, attorneys for appellant (Anthony F. DellaPelle, of counsel and on the briefs; Allan C. Zhang, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Alexander J. Falciani, Deputy Attorney General, on the brief).

PER CURIAM

Appellant 976 Newark Realty, LLC appeals from a January 17, 2020 order for final judgment and payment of funds in this partial condemnation action affecting a small, vacant industrial parcel adjacent to the Pulaski Skyway in Jersey City. We affirm.

We discern the following facts from the record. As part of the State Department of Transportation's (DOT) Pulaski Skyway Rehabilitation Project (the Project) in Jersey City, the DOT exercised its power of eminent domain and acquired a bridge easement and an aerial utility easement comprising approximately 360 square feet of the subject property (the Property). The easements grant a non-exclusive right to the DOT to enter the Property with

equipment and personnel to inspect, repair, and reconstruct the piers of the Pulaski Skyway.

The Property is approximately 0.8 acres and consists of nine contiguous lots—Block 7603, Lots 8-16—bordered by the Pulaski Skyway, a Conrail freight line, and Port Authority rail lines. The Property is basically unimproved vacant land with dilapidated pavement, a sidewalk, and metal fencing. It is zoned Industrial, which limits building heights to fifty feet and prohibits commercial and residential uses.

The Property is subject to a pre-existing easement. In February 2014, Public Service Electric & Gas Company (PSE&G) acquired a twenty-foot wide utility easement bisecting the westerly portion of the Property (Lots 10, 11, and 12) from James M. Salerno for $200,000. The easement prohibits buildings and structures within the easement area. It permits the relocation of the underground electric line to a "mutually satisfactory" location at the "sole cost and expense of the [g]rantor."

In March 2015, appellant contracted with James M. Salerno to purchase the Property for $1,852,635.99 and Block 7604, Lot 2 (Lot 2) for an additional $1,346,364.01. A road runs between Lot 2 and the Property. At the time, Salerno was in poor health and did not market the Property for sale. The

3

Property was being leased to a tenant, which may have affected the contract price. Because of Salerno's illness, the closing was delayed until May 2018.

Salerno died before the purchase was finalized. As of January 23, 2018, the date DOT filed its condemnation complaint, defendant Estate of James M. Salerno was still the owner of the Property. DOT filed a declaration of taking of the Property on February 12, 2018.

The parties retained experts to value the Property and just compensation. DOT's appraiser, Mark Karavolos, MAI, SCGREA, used the sales comparison method of evaluation. After adjustments, he opined that the fair market value of the Property was $982,000 and just compensation for the taking was $4200, with a highest and best use as industrial as permitted under the zoning code. Karavolos explained that the Property "is not particularly suitable for residential or mixed-use . . . development" because it is "located within an active industrial area that is physically severed from other mixed-use areas of the city."

Appellant retained three experts: Jeffrey Wenger, P.P.; Maurice J. Stack, II, MAI; and Eli D. Martin, RA. Wenger, a former professional planner, authored two reports. In his March 18, 2019 report, Wenger opined that if appellant submitted a plan to develop the property with an eight-story, high-density residential and commercial building, a zoning change through the redevelopment process would probably be granted. The report did not consider

the twenty-foot wide PSE&G easement.  Martin prepared a concept plan illustrating the proposed eight-story, mixed-use structure.  The plan did not consider the pre-existing PSE&G easement.  As of the date of taking, appellant had not approached Jersey City officials to begin the redevelopment process.

Stack, appellant's appraiser, reviewed both Wenger's and Martin's reports and valued the fair market value of the Property and Lot 2 at $13,620,000, explaining that "a mixed-use redevelopment was maximally productive compared to any other viable alternative as of the date of value."  He initially valued just compensation for the taking at $520,000.  Shortly before trial he reduced it to $475,000.

The case was presented to the condemnation commissioners for a decision on the compensation to be paid to appellant for the partial taking of its property.  Following a July 10, 2018 hearing, the commissioners filed a report with their award.[1]  Appellant sought a trial de novo in the Law Division pursuant to N.J.S.A. 20:3-13(a) and (b), contesting the amount of just compensation.

Prior to trial, DOT moved in limine to bar appellant's experts from testifying as to the potential use of the Property for a mixed-use, eight-story building.  DOT contended that appellant's experts' opinions were based on

---

[1]  The results of that hearing are not part of the record.

highly speculative evidence. It argued appellant's experts: (1) failed to value the actual condition of the Property; (2) failed to show a reasonable probability of obtaining the necessary zoning changes for a high-density, eight-story mixed use building; (3) failed to address the positive and negative criteria to sustain needed variances; (4) failed to address the PSE&G easement; (5) did not consider that appellant was not the record title owner of the Property on the valuation date; (6) did not refer to any filed site plan approval applications; (7) improperly expanded the Property by including non-contiguous Lot 2; and (8) based their valuation on conjecture and inadmissible net opinions.

The court granted the motion in part, ordering a N.J.R.E. 104 hearing be conducted "for the court to perform its gatekeeping function and determine whether there exists sufficient evidence of a reasonable probability of a zoning change and approvals to permit an alternate use of a mixed-use [eight]-story development." The court denied DOT's motion.

During the hearing, appellant moved in limine to bar reference to the $1,852,635.99 purchase price of the Property, contending that the purchase price was not relevant to fair market value and would be unduly prejudicial. DOT argued the purchase was highly probative and that DOT would be prejudiced if it could not use the purchase price during cross-examination of Stack. The court denied appellant's motion. The court concluded the jury would want to know

the purchase price, that it was relevant to the jury's overall decision, and that the purchase price was not unduly prejudicial because appellant could produce evidence explaining why the purchase price was so low—that Salerno was unhealthy and the subject property never officially went on the market, and thus not indicative of fair market value.

The jury trial began on November 12, 2019. Karavolos testified that in valuing the just compensation at $4200, he evaluated the highest and best use of the Property as industrial. Karavolos determined the fair market value of the Property by reference to recent comparable sales of four nearby properties. Karavolos acknowledged that unlike the properties evaluated by appellant's appraisal expert, the comparable sales he used were not delineated in a redevelopment area. On cross-examination, Karavolos was asked whether he used the 2015 purchase price in his valuation. Karavolos replied that "[he] could not."

Appellant offered the expert testimony of Wenger, Martin, and Stack. Consistent with his report, Wenger testified that appellant had a reasonable probability of obtaining approval to construct an eight-story, mixed use building up to 100 feet in height on the Property. He acknowledged that the proposed use would require a zoning change. Wenger further acknowledged that as of the date of taking, appellant had not approached Jersey City to redevelop the

Property nor had Jersey City conducted a preliminary investigation or adopted a resolution declaring the Property in need of redevelopment. Wenger further testified that DOT's taking impacted appellant's ability to redevelop the Property because Jersey City would require a fifteen-foot-wide sidewalk for a structure of this scale. This would require pushing back the portion of the proposed building adjacent to the Pulaski Skyway by almost 800 square feet, thereby limiting development.

Stack testified that in arriving at his revised estimate of just compensation of $475,000, he concluded that the highest and best use of the Property would be a mixed-use redevelopment, not the currently zoned industrial use, and evaluated the Property by comparing the sale prices of nearby redeveloped properties. He explained that appellant had purchased the Property for redevelopment.

On cross-examination, Stack was asked about the 2015 contract to sell the Property and Lot 2, and Stack answered that it was roughly $3.2 million. Later, Stack testified regarding the difference between the $3.2 million purchase price and his $13 million valuation. He stated: "[T]he party that purchased [the Property] had the vision, knowing that . . . the market was heading in a direction or else they wouldn't have paid $3 million for a parking lot." When asked why he did not use the sale price of the Property to indicate its value, Stack answered:

One of the . . . reasons you check to make sure that a sale is really kind of a -- a negotiated transaction, . . . it has to meet the test of market value, and it really has to involve competition. There has to be exposure to the marketplace, as opposed to, you know, one person that's coming in, buying a property from a person that's not really motivated. And that was the . . . situation here.

And, in the technical terms, this is referred to as a non-useable sale. That's the way the City of Jersey City treated it for property-tax purposes, because it involved an estate and . . . the seller really . . . didn't take advantage of the . . . full real-estate market.

Stack testified that he did not feel the 2015 sale price was accurate for purposes of determining fair market value because "it's not the same area as it was in 2015." When pressed, Stack explained that the combined $3.2 million purchase price involved two transactions and two deeds. Appellant purchased the Property for $1,852,635.99 and Lot 2 for $1,346,364.01, as reflected in in Stack's March 19, 2019 report. DOT then challenged Stack's credibility by having him acknowledge that his appraised value was $13 million. Appellant did not object to DOT's reference to the purchase price during cross-examination and did not request a curative or limiting instruction.

DOT presented two rebuttal witnesses: Roger Trudeau of PSE&G's real estate division and professional planner Keenan Hughes, AICP, PP, CRE. Trudeau testified regarding the significant impact of PSE&G's utility easement,

9 <span>A-2630-19</span>

which prohibited construction of any buildings within the easement area, and the requirement that any relocation of the powerline would have to be agreed upon by both parties. He explained that it was not feasible to relocate PSE&G's recently installed 230-kilovolt underground transmission line to an off-site location since PSE&G never consented to its relocation and it was doubtful the PSE&G ever would consent given the physical location and alignment of the Pulaski Skyway piers. He also noted that the developer would have to satisfy the high costs, permits, and legal obstacles associated with the relocation.

Hughes testified that approval of the proposed eight-story, mixed use building was not reasonably probable as to either redevelopment approval under the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -73, or the granting of necessary use and bulk variances under the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163. Hughes explained that Jersey City's Master Plan and land use policies provided for industrial development of the Property, not mixed-use development as proposed by appellant.

During closing, without objection by appellant, DOT emphasized that the Property is zoned industrial, subject to the PSE&G easement with a 230-kilovolt underground cable, was not located in a redevelopment zone, and had not been approved for redevelopment by Jersey City. DOT argued that appellant, a developer, purchased the Property and the accompanying lot on speculation for

10

$3.2 million but its expert claimed that even though the purchase closed after the taking, the fair market value of the Property and Lot 2 was actually $13 million.

The trial court instructed the jury that the attorneys were there as advocates for their clients, nothing the attorneys said was evidence, and their comments were not binding. As to expert testimony, the court instructed the jury that expert testimony was offered for their consideration, that an expert's opinion should be used only if they found it helpful, and that they may consider the expert's "skill, training, experience, and general credibility." Appellant did not object to the jury charges.

The jury returned a verdict of $56,000. Appellant did not move for a new trial. This appeal followed.

Appellant raises a single point for our consideration:

POINT I

THE TRIAL COURT ERRED IN PERMITTING EVIDENCE RELATING TO THE SALE OF THE SUBJECT PROPERTY TO BE CONSIDERED AND HEARD BY THE JURY AS SUCH EVIDENCE WAS NOT RELEVANT AND, TO THE EXTENT IT HAD ANY PROBATIVE VALUE, SUCH PROBATIVE VALUE WAS OUTWEIGHED BY THE PREJUDICIAL IMPACT IT HAD UPON THE JURY.

A-2630-19

A. The Price Paid For The Subject Property By 976 Newark Realty Was Irrelevant To The Issue Of Just Compensation.

B. Any Probative Value That The Price Paid For The Subject Property May Have Had Was Substantially Outweighed By Its Prejudicial Impact Upon 976 Newark Realty.

We are guided by certain well-established principles. When the government takes private property for public use, it must pay just compensation to the property owner. U.S. Const. amend. V; N.J. Const. art. I, ¶ 20. "Just compensation is 'the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.'" Comm'r of Transp. v. Caoili, 135 N.J. 252, 260 (1994) (quoting State v. Silver, 92 N.J. 507, 513 (1983)).

The Eminent Domain Act of 1971 requires that just compensation be calculated as of the earliest of:

> (a) the date possession of the property being condemned is taken by the condemnor in whole or in part; (b) the date of the commencement of the action; (c) the date on which action is taken by the condemnor which substantially affects the use and enjoyment of the property by the condemnee; or (d) the date of the declaration of blight[.]
>
> [N.J.S.A. 20:3-30.]

Here, the condemnation complaint was filed on January 23, 2018, and the declaration of taking was filed on February 12, 2018.

We have previously described eminent domain trials relating to the value of just compensation as "essentially an information inquisition in which the boundaries of the inquiry must for pragmatical reasons be liberally entrusted to the sound discretion of the trial judge." N.J. Highway Auth. v. Rudd, 36 N.J. Super. 1, 3 (App. Div. 1955).

"'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Relevant evidence is generally admissible, N.J.R.E. 402, but may be excluded "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "Evidence should be barred if its probative value 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue[s].'" Green v. Mfrs. Ins. Co., 160 N.J. 480, 491 (1999) (alterations in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).

We review the trial court's evidentiary rulings under an abuse of discretion standard, so long as the court's ruling is consistent with the applicable law.

Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008); Verdicchio v. Ricca, 179 N.J. 1, 34 (2004).  We likewise review a trial court's grant or denial of a motion in limine for abuse of discretion.  Brenman v. Demello, 191 N.J. 18, 31 (2007) (citing Green, 160 N.J. at 492).  An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. I.N.S., 779 F.2d 1260, 1265 (7th Cir. 1985)).  "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'"  State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

The price the owner paid for the Property, "if it meets certain qualifications," is "an exceedingly important piece of evidence"  Rudd, 36 N.J. Super. at 4-5 (citing 5 Nichols, Eminent Domain 266, § 21.2).  The sale must be "bona fide, such as to exemplify the bargain of a willing seller and a willing buyer, and that the sale occurred within a reasonable time of the value date in the condemnation proceedings." Id. at 5.  "Where evidence of sale to the owner possesses the requisite essentials and is not destitute of probative worth because of special circumstances, it is admissible." Rudd, 36 N.J. Super. at 5 (citations omitted).

A-2630-19

During the Rule 104 hearing, it became clear the State planned to introduce evidence of the Property's purchase price. Appellant moved in limine to exclude reference to the purchase price, arguing that admittance of the purchase price would unduly prejudice it by "letting [the] jury hear that the property was purchased three years before the date of taking from an estate under some sort of non-market conditions." In response, DOT argued that the purchase price would be probative with respect to the expert witnesses' valuations. DOT contended that a categorical bar of the purchase price would prejudice it by hindering its ability to impeach appellant's appraisal expert.

The judge denied appellant's motion, explaining that although he was not yet sure whether the price was important, it would be "if the experts used that price in any sense at all." He concluded that the price was not "unduly prejudicial because there's an explanation from both experts as to that." He noted that the jury would want to know the price and any related explanation. The judge further noted Stack's explanation "that it was, in effect, a short sale. It was a fire sale." The seller did not foresee the potential development of the property that appellant envisioned. The judge ruled the price was admissible, finding it was relevant and not unduly prejudicial because appellant could overcome any prejudicial impact.

Appellant contends that the trial court erred by denying its motion in limine to categorically bar evidence of the Property's purchase price. Specifically, it contends that the trial court should have barred this evidence because the $3.2 million purchase price in 2015 is not indicative of the subject property's fair market value. Appellant claims that the purchase price was not bona fide and was otherwise not used in either party's expert's fair market valuations. We are unpersuaded by its argument.

The judge's findings are supported by the record. The price paid by appellant was still relevant even though not relied upon by the experts in valuing the property. The March 2015 sale contract was entered into three years before the taking, but the sale was closed three months after the taking. In contrast, the purchase in <u>Rudd</u> closed almost seven years before the taking. It was also relevant to Stack's credibility, who referred to the purchase price in his report.

At trial, appellant had a full opportunity to demonstrate reasons why it contended the price was not indicative of the fair market value. Moreover, during cross-examination of Stack, the State asked: "Why didn't you use the sale of the subject property, the assemblage sale of the subject property, as a sale to indicate the value in this appraisal assignment?" Stack answered:

> One of . . . the reasons you check to make sure
> that a sale is really . . . a negotiated transaction, . . . it
> has to meet the test of market value, and it really has to

16

involve competition. There has to be exposure to the marketplace, as opposed to, you know, one person that's coming in, buying a property from a person that's not really motivated. And that was . . . the situation here.

And, in the technical terms, this is referred to as a non-useable sale. That's the way the City of Jersey City treated it for property-tax purposes, because it involved an estate and . . . that the seller . . . didn't take advantage of the -- of the full real-estate market.

Stack further testified that he included in his valuation report that the seller of the subject property was ill and, in an effort to rationalize how a property worth over $13 million in 2018 was sold in 2015 for $3.25 million, opined that "the party that purchased [the subject property] had the vision . . . the market was heading in a direction or else they wouldn't have paid $3 million for a parking lot." In addition, appellant asked Karavolos during cross-examination whether he used the 2015 purchase price in his valuation. Karavolos replied that "[he] could not." Indeed, the purchase price was not used by either Karavolos or Stack as a comparable sale. Its use was limited to impeaching Stack. Consequently, the sale to appellant did not have to qualify as a comparable sale.

When coupled with Karavolos' testimony that his valuation was based on the comparable sales he used, not the purchase price, Stark's testimony demonstrates that DOT's use of the purchase price during cross-examination was

17

not unduly prejudicial. We are therefore convinced the judge did not abuse his discretion by denying appellant's motion in limine.

Similarly, DOT's references to the purchase price during its closing were permissible comment on the credibility of appellant's appraisal expert. Appellant's reliance on State by Comm'r of Transp. v. Birch, 115 N.J. Super. 457 (App. Div. 1971), is misplaced. In Birch, plaintiff's counsel improperly admonished the jury that "this is going to be a landmark case," that "will largely determine how much the State Treasury will have to pay in similar situations" in the future. Id. at 466. Counsel then told the jury, "[w]e know where the money is coming from." Ibid. Unlike in Birch, this case did not include any inappropriate comments by DOT's counsel.

In addition, appellant did not object to counsel's comments. We therefore review for plain error that is "clearly capable of producing an unjust result." R. 2:10-2. We find no such plain error.

Finally, we reject appellant's speculation that the jury based its decision on the purchase price rather than following the court's instructions "to decide . . . which witnesses to believe and which witnesses not to believe," to consider whether the witness was biased, and to consider whether the "witness' testimony [was] reasonable when considered in the light of other evidence [the jury] believe[d]." We presume that the jury followed the court's instructions. Bldg.

Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 475 (App. Div. 2012) (citing Windmere, Inc. v. Int'l Ins. Co., 208 N.J. Super. 697, 715 (App. Div. 1986)).

In sum, we discern no basis to overturn the jury's verdict.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2630-19